## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| **DAVID ALAN SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 13-cv-10774** |
| ) | |
| **v.** ) | **Hon. Mark A. Goldsmith** |
| ) | |
| **LEXISNEXIS SCREENING** ) | |
| **SOLUTIONS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

### JOINT FINAL PRETRIAL ORDER

AND NOW on this 10th day of October, 2014, and pursuant to the Court's August 12, 2014 Order, Plaintiff David Alan Smith and Defendant LexisNexis Screening Solutions, Inc. (collectively "the parties"), hereby submit this Revised Joint Proposed Pretrial Order, containing additional information in sections (d)(vii) and (e) as required by the Order (Dkt. No. 26).

(a) <u>Jurisdiction:</u>          The parties agree that this Court has jurisdiction over this matter.

(b) <u>Trial:</u>              The case will be tried to a jury.  The parties estimate that the trial will last four (4) days.

(c) <u>Settlement:</u>          The parties have conferred regarding settlement.

(d) <u>Statement of Claims and Defenses:</u>

Plaintiff claims that Defendant LexisNexis Screening Solutions, Inc. (LexisNexis) violated 15 U.S.C. § 1681e(b) of the Fair Credit Reporting Act (FCRA), which requires that consumer reporting agencies like LexisNexis "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the [agency's] report relates." 15 U.S.C. § 1681e(b).

(i)     The elements required to establish a negligent violation under section 1681e(b) are:
- the defendant reported inaccurate information about the plaintiff
- the defendant failed to follow reasonable procedures
- the plaintiff suffered injury; and
- the defendant's conduct was the proximate cause of the plaintiff's injury.

*See* 15 U.S.C. § 1681e(b); *Nelski v. Trans Union, LLC*, 86 Fed. App'x 840, 844 (6th Cir. 2004).  Plaintiff also seeks to prove that LexisNexis's violation of Section 1681e(b) was willful, which will require him to prove that LexisNexis's violation was reckless.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).

(ii)  Facts supporting Plaintiff's claim (indicate contested or uncontested)

- In December 2012, Plaintiff David Alan Smith applied for a position with Great Lakes Wine & Spirits (Great Lakes).  *Uncontested*.
- Plaintiff was offered a position with Great Lakes contingent on a clean background check.  *Uncontested*.
- LexisNexis produced and sold a consumer report about Plaintiff to Great Lakes on December 12, 2012.  *Uncontested*.
- The consumer report contained a felony conviction for "uttering a forged instrument" which related not to Plaintiff but to a David Oscar Smith, an unrelated individual with a different social security number and different date of birth. *Contested*.
- Plaintiff was denied employment with Great Lakes as a result of the December 12 LexisNexis report.  *Contested*.
- LexisNexis had notice of hundreds of instances in which it inaccurately included on a consumer report information relating to a person other than the subject of the report. *Contested*.
- LexisNexis uses only first and last name to match criminal record information to consumer reports, and does not use middle names, social security numbers, or dates of birth.  *Contested*.

(iii)  Legal authority (see above)

(iv)  Elements of defenses:  Defendant agrees with Plaintiff's recitation of the four elements of his claim at (i) above.  Defendant further agrees that Plaintiff has established the first of the four elements (that the defendant reported inaccurate information about the plaintiff).  Defendant will contend that Plaintiff cannot establish the remaining three elements of his claim:  in other words, Defendant will contend that it followed reasonable procedures when it created its December 2012 report about Plaintiff; that Plaintiff suffered little or no cognizable emotional distress, mental anguish, or humiliation

due to that report; and that its report did not cause Plaintiff's alleged six week wage loss.  Defendant will further contend that it did not willfully violate the FCRA and cannot be subjected to punitive damages.

(v)    Every fact in support of the defenses (indicate contested or uncontested):

• Before Defendant will list a criminal record on a consumer report, Defendant requires a match between a consumer's first name, last name, and date of birth as provided by the employer, and the first name, last name, and date of birth in the criminal record in the database.

• In an attempt to avoid "false positive" matches, Defendant will use additional information if it is provided by the employer and present in the criminal record in the database.   *Contested.*

• Great Lakes did not provide Defendant with Plaintiff's middle name.  *Contested.*

• LexisNexis received criminal record data from Bay County, Florida and from the Florida Department of Corrections which did not contain David Oscar Smith's social security number. *Contested.*

• LexisNexis has a general dispute rate of approximately two-tenths of one percent. *Contested.*

• The "merchandiser" position that Great Lakes initially offered to Plaintiff in December 2012 was not the position that Plaintiff wanted and was not a position that Plaintiff would have accepted. *Contested.*

• Great Lakes acquired Plaintiff's prior employer (Tasson Distributing) in December 2012.  Great Lakes did not hire any of Tasson's four drivers, including Plaintiff, until January 2013.  *Uncontested.*

• LexisNexis sent Great Lakes a corrected report about Plaintiff on January 10, 2013.  Great Lakes confirmed on that same date that Plaintiff was "ok to hire," and Great Lakes had him begin work when a driver position became available. *Uncontested.*

• Plaintiff testified that he never told anyone other than his wife about any emotional distress related to LexisNexis's December 2012 report, and that he never considered seeking medical assistance for that distress.  *Uncontested.*

• Plaintiff testified that he did not believe that LexisNexis acted willfully or recklessly when it created its December 2012 report. *Contested.*

3

• Defendant does not track consumer disputes by category. In litigation, it has provided estimates of the number of disputes in which a consumer correctly contended that criminal information in a report pertained to someone else, but these are: i) estimates; and ii) a fraction of the disputes that Defendant receives, and a fraction of the reports that Defendant creates. *Contested.*

(vi)  Legal Authority in Support of the Defenses

"15 U.S.C. § 1681e(b) requires consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy" when preparing a consumer report. Although a showing of inaccuracy is an essential element of a claim under § 1681e(b), the FCRA does not impose strict liability for incorrect information appearing on an agency's credit reports. Liability flows only from a failure to follow (1) reasonable procedures (2) to assure maximum possible accuracy of the information (3) concerning the individual about whom the information relates." The exercise of reasonable care is determined by reference to what a reasonably prudent person would do under the circumstances. In order to assert a claim under § 1681e(b), a plaintiff must prove; (1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury."

*Nelski v. Trans Union, LLC*, 86 Fed. Appx. 840, 844 (6th Cir. 2004) (citations omitted); *see also Miller v. Wells Fargo & Co.*, No. 3:05-CV-42-S, 2008 U.S. Dist. LEXIS 23103, *14 (W.D. Ky. March 24, 2008) ("[I]t is well established that the FCRA is not a strict liability statute and the mere reporting of inaccurate information is not enough to create liability") (citing *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996)).

"Actual damages for a FCRA violation may include humiliation and mental distress. An injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements." *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 361 (6th Cir. 2005); *see also Kaplan v. Experian, Inc.*, No. 09-10047, 2010 U.S. Dist. LEXIS 60098, *16 (E.D. Mich. May

4

26, 2010) (granting a defense motion for summary judgment because "Plaintiff has provided vague and conclusory statements that do not raise any genuine issue of material fact on the issue of whether Experian's violation caused Plaintiff to incur any compensable emotional distress damages").

Defendants may be held liable for punitive damages if they willfully violate a provision of the FCRA.  15 U.S.C. §1681n.  A willful violation is a violation committed knowingly or recklessly.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).  Recklessness is "conduct violating an objective standard:  action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known'"; it "requires a known or obvious risk that was so great as to make it highly probable that harm would follow."  *Id.* at 69.  "A company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.*

(vii)   Calculation of damages:  Plaintiff seeks economic damages in the form of six weeks of lost wages for a merchandiser position that he could have held with Great Lakes in December 2012 and January 2013.  The parties agree that the amount of this claimed economic loss is $2,640.00.   Plaintiff further seeks actual damages for emotional distress, mental anguish, and embarrassment as a result of being denied employment, not least of which includes the humiliation and embarrassment of being wrongfully identified as a felon because of someone else's deviant criminal activity.  Plaintiff also seeks punitive damages.

(e)  Lay Witnesses:

This Court's Order at ECF No. 26 required each party to state "the facts which that Party expects that witness to establish through his or her testimony."  Either party may call any of the four witnesses listed below. Plaintiff's statement of the facts to which each witness will testify is provided after the name of each witness.   Due to length, Defendant's statement of the facts to which each witness will testify is being provided in an addendum which appears at the end of this document.

(i)  David Alan Smith
233 Country Road
Champion, MI 49814

Will testify concerning his claims and damages.  Specifically, he will
testify that he applied for a position with Great Lakes in December 2012,
that he was offered a position with Great Lakes contingent on a clean
background check.  He will further testify that the consumer report
produced about him in connection with his application contained a felony
conviction for "uttering a forged instrument" which related not to Plaintiff
but to a David Oscar Smith, an unrelated individual with a different social
security number and different date of birth.  Plaintiff will further testify
that he was denied employment with Great Lakes, and that he lost wages
as a result of this loss of employment.  He will further testify regarding the
emotional distress connected to Defendant's inaccurate reporting.

(ii)  Amy Smith
233Country Road
Champion, MI 49814

Will testify concerning Plaintiff's claims and damages.  Specifically, she
will testify that her husband David Alan Smith applied for a position with
Great Lakes, and that he was offered a position contingent on a clean
background check.  Mrs. Smith will further testify that Mr. Smith was
denied employment with Great Lakes, and will testify regarding Mr.
Smith's emotional distress connected to Defendant's inaccurate reporting.

(iii)  Vicki Strawsine
Great Lakes Wine & Spirits
373 Victor Street
Highland Park, MI 48203

Ms. Strawsine will testify concerning Plaintiff's application for
employment with Great Lakes and Great Lakes' use of a LexisNexis
consumer report to evaluate Plaintiff for employment.  Ms. Strawsine will
further testify regarding the compensation and benefits available for
Great Lakes employees.

(iv) Matthew O'Connor
     LexisNexis Risk Solutions, Inc.
     21000 Alderman Drive
     Alpharetta, GA 30005

Will testify that Defendant produced and sold a consumer report about Plaintiff to Great Lakes on December 12, 2012, and that the report contained for "uttering a forged instrument" which related not to Plaintiff but to a David Oscar Smith with a different social security number.  Mr. O'Connor will further testify regarding Defendant's notice of prior instances when LexisNexis inaccurately included criminal record information on consumer reports.  Mr. O'Connor will also testify regarding Defendant's practices and procedures for matching criminal record information to individual consumers about whom it prepares and sells background reports.

(f)  Expert Witnesses:

Neither party intends to call any expert witnesses.

(g)  All Witnesses:

All of Plaintiff's and Defendant's witnesses are listed in Part (e) above.

(h)  Depositions: Plaintiff may introduce the testimony of Vicki Strawsine and Matthew O'Connor by deposition.  Defendant may introduce the testimony of Ms. Strawsine and Plaintiff by deposition.

(i)  Exhibits:

Plaintiff's Exhibits:

1.  December 12, 2012 offer of employment email from Michael Kilano to David Alan Smith, bates-labeled SMITH_012 to SMITH_013.

2.  December 12, 2012 Great Lakes Wine & Spirits signed offer of employment, bates-labeled SMITH_014.

3.  December 12, 2012 LexisNexis report for David Alan Smith, bates-labeled LNSCR000006 to LNSCR000015.

4.  December 12, 2012 LexisNexis communication to David Alan Smith, bates-labeled LNSCR000001 to LNSCR000005.

5.  December 12, 2012 Great Lakes Wine & Spirits employment denial letter to David Alan Smith, bates-labeled SMITH_001.

6. Material faxed by David Alan Smith to LexisNexis, bates-labeled LNSCR000016.

7. LexisNexis WPS-Consumer Dispute Management pertaining to David Alan Smith, bates-labeled LNSCR000022 to LNSCR000025.

8. Florida Department of Corrections record for David Oscar Smith, bates-labeled SMITH_115 to SMITH_118.

9. January 11, 2013 LexisNexis communication to David Alan Smith, bates-labeled LNSC000017 to LNSCR000021.

10. Undated Declaration of Matthew O'Connor regarding the frequency of the erroneous appearance of criminal record information on LexisNexis consumer reports from consumers living in Virginia.

11. Undated Declaration of Matthew O'Connor regarding the frequency of the erroneous appearance of criminal record information on LexisNexis consumer reports from consumers living in Georgia.

12. Undated Declaration of Matthew O'Connor regarding the frequency of the erroneous appearance of criminal record information on LexisNexis consumer reports from consumers living in Michigan.

13. Interrogatory responses in *Espinosa v. LexisNexis Screening Solutions, Inc.*, No. 10-4808 (D. N.J.), bates-labeled SMITH_119 to SMITH_135.


Defendant's Exhibits:

Defendant will offer Plaintiff's Exhibits 1-7 and 9 as identified above. Defendant will also offer a number of additional exhibits, which are identified below by letter.

A.    December 6, 2012 Delivery Driver Application, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, pp. 29, 31-35.

B.    December 6, 2012 "Authorization for Background Checks," produced by Great Lakes Wine & Spirits as Strawsine Ex. 6.

C.    December 12, 2012 Great Lakes Wine & Spirits employment denial letter to David Alan Smith, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, p. 13 of 45.

D.      January 10, 2013 LexisNexis communication to Great Lakes Wine & Spirits, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, pp. 14-15 of 45.

E.      January 10, 2013 internal Great Lakes Wine & Spirits email, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, p. 21 of 45.

F.      January 11, 2013 LexisNexis communication to David Alan Smith, bates-labeled LNSC000017 to LNSCR000021.

G.      January 18, 2013 internal Great Lakes Wine & Spirits email, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, p. 20 of 45.

H.      January 29, 2013 Delivery Driver Application, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, p. 30.

I.      Documents completed on Plaintiff's start date of January 29, 2013, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, pp. 37-40.

J.      January 30, 2013 internal Great Lakes Wine & Spirits email, produced by Great Lakes Wine & Spirits as Strawsine Ex. 3, p. 27 of 45.

K.      Chart from Marquette Depot, bates-labeled SMITH_018.

L.      Raw data file used by LexisNexis when it created its December 12, 2012 report.

(j)  Evidentiary Issues:

Pursuant to the Court's Order at ECF No. 26, the parties made certain evidentiary objections in a separate pretrial memorandum at ECF No. 27.   The parties subsequently met and conferred and agreed that those objections are WITHDRAWN in their entirety.   Neither party will object to the other party's use of the above-designated exhibits as evidence, and neither party will object to the other party's attempt to introduce evidence (including evidence of historic dispute rates or of notice of allegedly inaccurate reports) described in the pretrial memorandum at ECF No. 27.

IT IS HEREBY ORDERED that the above constitutes the pretrial order for the above captioned case submitted by stipulation of the parties.

IT IS SO ORDERED this 28th day of October, 2014

S/MARK A. GOLDSMITH
UNITED STATES DISTRICT JUDGE

Each of the undersigned counsel for the parties hereby consents to the entry of the foregoing pretrial order, which has been prepared in accordance with the form pretrial order adopted by this court.

**FRANCIS & MAILMAN, P.C.**

*/s/ John Soumilas*
JOHN SOUMILAS
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110
jsoumilas@consumerlawfirm.com

Counsel for Plaintiff

**PICADIO, SNEATH, MILLER & NORTON, P.C.**

*/s/ Jason A. Spak*
JASON A. SPAK
Four Gateway Center
444 Liberty Avenue, Suite 1105
Pittsburgh, PA 15222
jspak@psmn.com

Counsel for Defendant

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DAVID ALAN SMITH,                          Case No. 4:13-cv-10774-MAG

        Plaintiff,                          Honorable Mark A. Goldsmith

  v.

LEXISNEXIS   SCREENING   SOLUTIONS,
INC.,

        Defendant.

## <u>DEFENDANT LEXISNEXIS SCREENING SOLUTIONS, INC.'S<br>STATEMENT OF WITNESSES AND FACTS</u>

At ECF No. 26, this Honorable Court ordered that the parties' proposed joint pretrial order "will state, at §(e), not only the name and contact information for each witness being called by each Party, but also the facts which that Party expects that witness to establish through his or her testimony."

As indicated in the proposed joint pretrial order being provided to the Court, Plaintiff's statement of witnesses and facts was provided on the face of the proposed joint pretrial order, while Defendant's statement of witnesses and facts is being provided in this separate document due to its length.

David Smith
233 Coney Road FFT
Champion, Michigan 49814.

1.      Mr. Smith loaded trucks at Jilbert Dairy from 2000-2002.

2.      He drove truck at Tasson Distributing from March 5, 2002 – December 12, 2012.

3.      His pay in 2012 was $16/hour, 8 hour days, plus $250/month for not taking health insurance.

4.      He had insurance through wife while at Tasson; he switched to GLWAS insurance after becoming a Teamster because it is cheaper.

5.      In November 2012, the Tassons told their four drivers and other employees that they would be selling to GLWAS.

6.      Mr. Smith was going on vacation during the second week of December 2012 (Saturday 12/8 – Sunday 12/16) to see family in Alpena.

7.      On the Thursday prior to that vacation (12/6), he met with Lou and Jim Smith from GLWAS to discuss working with GLWAS.

8.      On that same day, he completed an application given to him by Brian Johnson.

9.      Nobody promised him a job; he assumed he'd keep his job.

10.     His wife got an email offering him a merchandiser job on December 12th or 13th while they were on vacation.  He isn't sure when he saw the email.  He thought the merchandiser position that he was offered was beneath what he could live on.  He did not accept that job because it didn't pay enough, given the fact that he would have had to use his own vehicle to drive to job sites.

11.     He went to the former Tasson depot after his vacation (on Monday 12/17 or maybe Tuesday 12/18) ready to work; he met with a woman who learned his name, said she had to make a phone call, then came back and told him to go home and wait for letter from LexisNexis.

12.     He saw GLWAS guys taking inventory during that first day; nobody was delivering anything.

13.     The other three Tasson drivers did not keep working in December 2012 and January 2013, after the GLWAS acquisition.

14.     GLWAS used other drivers from another distributor in the interlude between mid-Dec 2012 (acquisition) and mid-January 2013.

15.     One of the three other Tasson drivers, Mike Boone, was later hired back at the Marquette depot by GLWAS in mid-January 2013.

16.     Plaintiff received his background report in the mail sometime after 12/17.

17.     The only inaccuracy in that report is the listing of criminal records for David Oscar Smith.

18.     Plaintiff called GLWAS about the error, and it told him to call LexisNexis; he did that and also faxed some information to dispute the criminal information in his report.

19.     Plaintiff never talked to the other drivers about this.  He doesn't think his former employer, Mike Tasson, knew about it either.

20.      When the report was corrected, he called Brian Johnson, who told him he was hired as a casual driver.

21.     The LexisNexis report made him "down in the dumps," but he never talked to anyone other than his wife, sought medical treatment, or considered seeking treatment.

22.     He now feels "disappointed" about what happened with the report.

23.     He does not think LexisNexis acted with recklessness or wilfullness

24     He doesn't know if he makes more or less than he did at Tasson.

25.     He wishes he had the routes that the other drivers have, as he knows the customers and thinks they are more profitable, but can't say that the report prevented him from getting them.

27.     He doesn't think he has been treated differently because of the report, but rather because he is a former Tasson employee.


Vicki Strawsine
Great Lakes Wine & Spirits (GLWAS)
373 Victor Street
Highland Park, Michigan 48203-3117

1.     In February 2008, two companies – General Wine & Liquor, and J. Lewis Cooper – formed GLWAS.

2.     Ms. Strawsine began working at J. Lewis Cooper in August 1997.

3.     She has worked for GLWAS since it was formed in February 2008.

4.     GLWAS acquired Tasson Distributing at the end of December 2012.

5.     Tasson employees were invited to interview for jobs with a hiring manager and to submit application materials to the hiring manager.

6.     If the hiring manager offered someone a job, Ms. Strawstine would obtain and review a criminal background report and credit check.

7.     If the criminal background report and credit check presented no obstacle to employment, Ms. Strawsine would obtain pre-employment physicals, go through every application package and make sure that all the correct forms were there, and then set them up with payroll.

8.     From 1997 - 1999, J. Lewis Cooper did criminal background checks by obtaining Michigan criminal records about employees from the Michigan state police.

9.     In 1999, J. Lewis Cooper began getting nationwide criminal records about its employees from an outside vendor.

10.     This practice (of getting national criminal records from an outside vendor) continued from 1999 to the present.

11.     To obtain a report, someone at GLWAS types the employee's name and other personal information into a computer and orders a report.

12.     If the report shows no criminal record, the person who ordered the report will clear the employee for hire without consulting Ms. Strawsine.

13.     If the report shows a criminal record, the person who ordered the report will bring it to Ms. Strawsine for review.

14.     Judy Rak ordered a report about Mr. Smith and brought it to Ms. Strawsine for review.

15.     Reviewing criminal background reports is a common part of Ms. Strawsine's job.

16.     She has declined applications due to criminal information before.

17.     She reviews criminal reports on a case by case basis, though theft is an automatic disqualifier.

18.     Since 1999, the only person whose application Ms. Strawsine denied due to a criminal background report, and who disputed the report, is Mr. Smith.

19.     GLWAS bought Tasson and closed the purchase at the end of December 2012.  Tasson employees were invited to apply for their old positions.

20.     As a part of this acquisition, no Tasson drivers were hired on the closing dates.

21.     Mr. Smith could not have been hired as a driver in December 2012 because no driver positions were open.

22.     The only positions open to former Tasson employees in December 2012 were office and sales positions.

23.     Jimmy Smith is in charge of all depots outside of metro Detroit; Brian Johnson manages the Marquette depot.

24.     Per union contract, each depot must have a set number of union driver jobs.  Jimmy Smith and Brian Johnson would have determined that number.

25.     If a depot does not have the required number of union driver jobs, current drivers can apply for those jobs in the following order – existing union drivers, existing casual drivers.  The depot manager tells Jimmy Smith and the new job(s) are posted on a wall in every depot so that existing drivers can apply.

26.     GLWAS intended to use existing drivers to staff the Marquette depot.

27.     If there weren't enough drivers at a depot, the depot manager would hire drivers off the street.

28.     Plaintiff filled out an application in December 2012 and was offered a merchandiser job because no driver positions were open.

29.     A merchandiser goes to a store and builds displays, stocks shelves, and busses bottles.

30.     Ms. Strawsine has authority to overlook someone's criminal history and clear them for hire anyway.

31.     Ms. Strawsine took the Smith report to upper management before deciding not to clear him for hire.

32.     The fact that a Florida conviction appeared on the Smith report did not signal an inaccuracy, as he could have lived there before.

33.     Ms. Strawsine saw that the conviction on the Smith report pertained to someone with a different middle name.

34.     It is not uncommon for Ms. Strawsine to see an applicant who has used an alias, different names, or different addresses.

35.     Ms. Strawsine therefore felt that Mr. Smith should clear up any name discrepancy with LexisNexis.

36.     Ms. Strawsine has no idea what LexisNexis does to assure that information in a report pertains to the employee being reviewed.

37.     Ms. Strawsine understood that Mr. Smith maintained at all times that there had been a mistake and, to her knowledge, "he was never accused of actually doing this by any representative of our company."

38.     Ms. Strawsine confirmed that GLWAS sent a letter dated 12/12/12, inviting him to dispute report with LexisNexis.

39.     LexisNexis advised GLWAS on January 10, 2013 that it had a new report on Smith, which contained no criminal record.

40.     GLWAS took that revised report as authorization to hire Dave Smith.

41.     Jim Smith was told by email on January 10 that it was okay to hire Dave Smith.

42.     Brian Johnson asked for and received confirmation on January 18 that he could hire Dave Smith.  Ms. Strawsine believes that Jimmy Smith was on vacation from January 10-18 and hadn't told Brian Johnson of this previously.

43.     Dave Smith was hired as a casual (non-union) driver on January 29, 2013.

Matthew O'Connor
LexisNexis Screening Solutions, Inc.
1 Concourse Pkwy NE #200
Atlanta, GA 30328

1.     Mr. O'Connor has worked in the background screening industry for almost two decades, at several different companies.

2.     He began his career in Tampa, FL, in a position that required him to make trips to local courthouses to gather and compile criminal record information about various individuals, at a salary of $8/hour.

3.     After a series of promotions, he now works as LexisNexis's Vice President of Operations, a position in which he supervises the employee teams that gather and compile criminal record information about individuals.

4.     He has personal knowledge of the policies and procedures that LexisNexis used to create the report about Plaintiff.  In March 2013, LexisNexis was acquired by First Advantage Corporation, and where relevant, Matt's testimony will include his knowledge of its procedures as well.

5.     Unless it attends a criminal trial and watches the jury issue a guilty verdict against a specific person, no company that creates criminal background reports can ever be 100% certain that a given person committed a specific crime.

6.     Companies like LexisNexis attempt to match the personal information that they have about a person (name, date of birth, social security number, etc.) with the personal information that appears in a public criminal record.

7.     The best matching information is information that is both readily available and does not change.

8.     Addresses, height, weight, hair color, mug shot photographs, etc. are not good matching choices because they are subject to change, and because they are not always readily available in a criminal record (e.g., some jurisdictions record this data; others do not).

9.     Fingerprints could be good matching choices because they do not change.  However, they are not readily available:  to use them, a screening company must obtain a copy of a person's fingerprints and then have a specialist attempt to match them with fingerprints kept on public

record.  This takes time, and it could mean that a job candidate has to wait weeks to be hired while his or her fingerprints are reviewed.

10.    Mr. O'Connor can speak to fingerprint reporting because some First Advantage clients are required by law to do a fingerprint check as part of every background report.  Banks are one example.  First Advantage gathers fingerprint data and submits it to the FBI, which attempts to match it with criminal records.  Matt's personal experience has been that this process is much more time consuming than a standard background report, and it is no more accurate:  the criminal record information that the FBI supplies is often incomplete, which means that First Advantage needs to conduct further review.

11.    Social security numbers can be good matching tools because they do not change and are widely available to consumers.  However, in an effort to preclude identity theft, an increasing number of court systems restrict the availability of SSNs:  some do not release the SSN to the general public, others only release part of an SSN (different courts release different parts).

12.    Dates of birth are excellent matching tools because they do not change, everyone knows his or her birthday, and court records almost always contain birthdates.

13.    A company like LexisNexis can create a criminal background report in one of two ways: on demand, or by database.

14.    To create a report "on demand," LexisNexis waits until a client orders a report about a specific individual with specific identifiers.  LexisNexis then goes to a specific court or court system, and it searches for criminal records in that system that match a person's identifiers.  Any matches are included in the report.

15.    To create a report "by database," LexisNexis uses a database that contains criminal records which it has obtained from all 50 states.  When a client orders a report, LexisNexis doesn't need to go to specific courts:  it can search its own database and find any matches.

16.    To create and update its database, LexisNexis has to get criminal records from every court in the United States.  To make this easier, LexisNexis buys "bulk data" from court systems that provide it.  For example, a state might have a central repository that keeps criminal records from each county court in that state.  Rather than sending individuals to search for new records every day from every one of those courthouses and then adding them to the database, LexisNexis can obtain data from the central state repository and add it automatically.

17.    Both methods require accurate data from the client about the person being searched.  If a client provides a wrong name, a wrong date of birth, etc., LexisNexis will only be able to find matches with the "wrong" information.

18.    There is no reason to believe that database reports as opposed to on demand reports are more reasonable or more accurate across the board.  Each has potential problems.

19.     One potential problem with "on demand" reports is human error:  a human may go to a courthouse and misread a record, or make a mistake when typing the details of that record into a report.  Matt will describe one court runner in Rhode Island who made consistent mistakes which led LexisNexis to believe that individuals who had committed multiple drug offenses had clean criminal records.

20.     Another problem with "on demand" records is the time they take.  It sounds appealing to say that criminal reports are worth taking as much time as is needed to get things right.  But in practice, when an employer wants to hire someone, and that someone wants to be hired, they both want the report done quickly, so that the person can start working and making money.

21.     Another problem with "on demand" reports is that they focus on specific criminal jurisdictions, usually a specific county or specific state.  Because people move from state to state, an "on demand" report that only looks for records in the state or county where a person currently lives will miss any crimes which that person committed at a prior address.

22.     Database reports have potential problems too.  Human error is not one of them.  Bulk records are obtained from a court system, so LexisNexis presumes they are accurate.  Because they are obtained electronically – the court system provides a database file which LexisNexis imports automatically – there is no danger of human mistakes (typing the wrong number for date of birth or the wrong letter in a name).

23.     However, bulk records sometimes have less matching information than records that are kept by a local court.  For example, Florida bulk records do not contain any part of the criminal's social security number.  However, different sources in Florida may provide at least part of a social security number if someone asks for an "on demand" record.

24.     Bulk records may also be less current than "on demand" records.  Suppose a bulk record about drunk driving was updated two months ago, but the record was expunged by the local court one month ago.  In this case, a database report would show the drunk driving record, but the "on demand" report would not.  The FCRA has rules about this, and LexisNexis follows them, but it is nevertheless an issue to consider.

25.     LexisNexis has a legal and financial incentive to create accurate reports.  If it creates a report with a "false positive" (a statement that someone has a criminal record, which actually pertains to someone else), there will be a complaint and quite possibly a lawsuit, which will cost money to resolve and defend.  If LexisNexis creates a report with a "false negative" (a statement that someone has no criminal record when, in fact, they do have one), its clients will be upset and possibly exposed to liability from co-workers, clients, or the government.

26.     Some people get reports with records that are not theirs.  Most of these problems are resolved without litigation.  But some people retain lawyers and file lawsuits, which they have a right to do.

27.     Some clients get reports that say someone has a clean record when they actually have a criminal record.  Matt was recently deposed in a lawsuit where Adecco hired someone after LexisNexis said she had no criminal record.  In fact, she had been convicted of embezzlement, and she went on to steal $12K from Adecco.

28.     LexisNexis has an incentive to avoid both false positives and false negatives.

29.     One example of an independent effort to assure accuracy:  Matt is a member of industry groups including NAPBS (National Association of Professional Background Screeners) and CDIA (Consumer Data Industry Association).  Both groups promote industry standards that LexisNexis tries to follow. They also push back when governments remove DOB or SSN information, as the absence of that information makes it harder to determine if a criminal record belongs to someone with the same name as the defendant.

30.     Another example of an independent effort to assure accuracy: some clients require LexisNexis to meet specific accuracy standards, and to pay a penalty per contract if those standards are not met.

31.     There is no perfect test for accuracy, so LexisNexis tracks the dispute rate:  out of every 1000 reports, how many are disputed by the consumer?  Internal data show that 99.98% of LexisNexis reports are never disputed, and .02% are disputed.

32.     Again, the dispute rate is not a perfect test for accuracy.  It is possible that some people are given reports which they feel are inaccurate, but never contact LexisNexis to dispute them. And sometimes a person contacts LexisNexis to dispute a report, LexisNexis reinvestigates, and LexisNexis concludes that the report was accurate and the consumer was mistaken.  Sometimes, too, people will dispute one of several criminal records, and the disputed record is removed but the other records remain.

33.     In short, we cannot say that 99.98% of LexisNexis reports are accurate.  But we can say that 99.98% are undisputed.  This figure has been consistent over time.  It does not vary depending on whether "on demand" or "by database" reports are used.

34.     Another example of an independent effort to assure accuracy:  LexisNexis reviewed its disputes to see if certain types of reports were more likely to be disputed than others.  This review showed that when consumers disputed reports based on data from a court runner in Broward County, FL, their disputes were very often upheld.  This suggested that the court runner might be providing inaccurate data, so LexisNexis investigated further.  This investigation showed that the disputes were taking more than 30 days to resolve – when a consumer made a dispute, LexisNexis would ask the court for its records, and the court would take more than a month to reply.  Because the law requires records to be removed within 30 days of a dispute unless they can be confirmed, the disputed records were not necessarily inaccurate:  they were being removed by law, because LexisNexis couldn't confirm them in 30 days.

35.     Great Lakes Wine & Spirits asked LexisNexis to provide a "National Criminal Record File Plus" report.  This kind of report was created by searching the national database that LexisNexis created using bulk records.

36.     Other clients that purchase this type of report from LexisNexis include Target and Home Depot.

37.     The first step in creating the report involved obtaining Smith's personal identifiers from Great Lakes.  Great Lakes did this by going to a website and typing information into spaces for name, date of birth, social security number, et cetera.

38.     Great Lakes provided Mr. Smith's first name, last name, date of birth, and social security number.  It did not provide his middle name.

39.     LexisNexis then searched for criminal records in its database which matched the information it received from Great Lakes.  It found several matches and included them in its report.

40.     The records in the report contain a middle name of Oscar.  If Great Lakes had provided LexisNexis with Mr. Smith's middle name – Alan – there would not have been a match, and these records would have been excluded.  LexisNexis does not require clients like Great Lakes to provide middle names because some people do not have a middle name, or they only have a middle initial.

41.     LexisNexis's report contained credit information about Mr. Smith that LexisNexis obtained from Experian.  This information indicated that Mr. Smith's name was "Dave A. Smith."  LexisNexis does not rely on the information that it receives from private sources like Experian.  In its experience, credit reports often contain multiple names about a consumer (e.g., a maiden name, or a former legal name).  LexisNexis does not believe that these names are accurate enough to use in its searches.

42.     Great Lakes did provide Mr. Smith's social security number.  If the Florida records that LexisNexis received had contained a different social security number, there would have been no match, and the records would not have appeared on its report.  However, the bulk files that LexisNexis received from the Florida Department of Corrections did not contain a social security number.  Neither did the bulk records that LexisNexis received from the Bay County Circuit/County Court.

Dated:  October 10, 2014          PICADIO SNEATH MILLER & NORTON, P.C.

/s/ Jason A. Spak

_____

Jason A. Spak, Esquire
Pa. I.D. No. 89077
Four Gateway Center
444 Liberty Avenue, Suite 1105
Pittsburgh, PA  15222
jspak@psmn.com
Phone:  (412) 288-4385
Fax:      (412) 288-2405