UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ALAN SMITH,

                Plaintiff,                          Civil Action No. 13-CV-10774

vs.                                               HON. MARK A. GOLDSMITH

LEXISNEXIS SCREENING
SOLUTIONS, INC.,

                Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW[1]

### I.    INTRODUCTION

This is a case brought by Plaintiff David Alan Smith against Defendant LexisNexis

Screening Solutions, Inc., pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.

§ 1681, et seq. Plaintiff alleged that Defendant both negligently and willfully failed to comply

with FCRA's mandate that consumer reporting agencies ("CRA") maintain "reasonable

procedures to assure maximum possible accuracy of the information concerning the individual

about whom the report relates." Id. § 1681e(b). The parties proceeded to a jury trial, which

resulted in a $375,000 verdict in favor of Plaintiff.

At the close of Plaintiff's proofs, and then again prior to the submission of the case to the

jury, counsel for Defendant orally moved for judgment as a matter of law, pursuant to Federal

Rule of Civil Procedure 50(a). Defendant argued that Plaintiff had failed to present sufficient

evidence that: (i) Defendant negligently failed to follow reasonable procedures; (ii) Defendant

---

[1] Given that the motion was made orally, there is no corresponding physical filing on the docket. However, the Court noted the motion on the docket on October 22, 2014. See October 22, 2014 minute entry.

willfully failed to follow reasonable procedures; (iii) Defendant's conduct was a proximate cause of Plaintiff's injury; (iv) Plaintiff suffered damages in the form of lost wages; and (v) Plaintiff suffered emotional distress.

The Court took under advisement Defendant's Rule 50(a) motion, and submitted the case to the jury, subject to a later decision on the motion. After deliberating, the jury returned a $375,000 verdict for Plaintiff, finding that Defendant had negligently and willfully failed to follow reasonable procedures. After dismissing the jury, the Court solicited briefing on the parties' arguments regarding Defendant's Rule 50(a) motion. Having reviewed the parties' briefs and the evidence of record, the Court determines that there was sufficient evidence on all claims to submit the case to the jury.[2] Accordingly, the Court denies Defendant's oral Rule 50(a) motion.

## II.    BACKGROUND

Plaintiff David Alan Smith worked delivering alcoholic beverages in the Upper Peninsula for Tasson Distributing ("Tasson") for ten years. Tr. Vol. 2B 45:25-46:6, 46:15-46:17 (Dkt. 47). In 2012, Tasson was sold to Great Lakes Wine and Spirits ("GLWS"). Id. 48:25-49:4. Tasson employees were not automatically rehired by GLWS; each worker had to reapply for a position. Id. 142:14-142:18. Plaintiff applied for a job with GLWS and requested the position of delivery driver, the same position he had held at Tasson. Id. 49:14-49:23, 50:16-50:20.

---

[2] As a threshold matter, the Court rejects Plaintiff's argument that, once the case was submitted to the jury, the Court no longer had authority to rule on the 50(a) motion. Plaintiff offers no case law adopting that view. See Pl. Supp. Br. in Response to Text-Only Order (Dkt. 51). In fact, the Advisory Committee Notes to the 1991 amendments to Rule 50 make clear that "the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence, and it is not inappropriate for the moving party to suggest such a postponement of the ruling until after the verdict has been rendered."

GLWS emailed Plaintiff an offer of employment for the position of merchandiser, not delivery driver, on December 12, 2012.  See Email, Pl. Ex. 4 to Pl. Resp. (Dkt. 41-5); Offer of Employment, Pl. Ex. 5 to Pl. Resp. (Dkt. 41-6).  The offer of employment indicated that "[c]ontinued employment, subsequent to this offer, is conditional based upon your satisfactory completion of a . . . criminal history check."  Offer of Employment.

Vicki Lynn Strawsine, the human resources director for GLWS, testified that, as part of the standard hiring process at GLWS, prospective employees were required to undergo a background check.  Tr. Vol. 2B 143:4-143:10.  According to Ms. Strawsine, the background check occurred toward the end of the hiring process, after an applicant submitted an application, was interviewed for the position, and received an offer of employment.  Id. 143:11-143:20.  Plaintiff had authorized Defendant to prepare a background report and provided GLWS with his full name — including middle name — date of birth, address, and social security number.  Id. 51:11-51:24.  GLWS contracted with Defendant to compile the background criminal report and credit check.  Id. 150:12-150:17.  GLWS provided Defendant with Plaintiff's first name, last name, date of birth, and social security number.  Id. 151:2-151:23.  However, GLWS did not provide Defendant with Plaintiff's middle name — a circumstance that turned out to be critical in this case.  Id.

The method by which Defendant prepares a criminal background report for a client depends upon the background screening package requested by the client.  Tr. Vol. 3 136:20-136:25 (Dkt. 48).  For the criminal history check, GLWS requested that Defendant conduct a search for records using Defendant's proprietary national criminal database.  Id. 137:1-137:5.  Defendant's criminal database is composed in part from "bulk data files" containing raw criminal data that are received from various government agencies.  Id. 31:12-32:19.  The raw

data contains any information regarding the crimes that the agency or other contributing source chooses to make available.  Id. 32:20-32:23.

In the course of preparing the criminal background report, Plaintiff's information, i.e. his first name, last name, and date of birth, matched with criminal records received in bulk by Defendant from two Florida agencies.  Id. 32:12-32:16, 139:15-139:21; Tr. Vol. 2B 62:8-62:12; see also Bulk Data File, Pl. Ex. 16 to Pl. Resp. (Dkt. 41-17).  The criminal records evidenced Florida convictions for fraud committed by an Alabama resident with the name David Oscar Smith.  Bulk Data File; see also Tr. Vol. 2B 62:8-62:12.  The bulk file reflecting these convictions did not contain social security number information.  See Bulk Data File.  It is undisputed that these crimes were not committed by Plaintiff David Alan Smith, a Michigan resident.

On December 17, 2012, after returning from vacation, Plaintiff went to GLWS to inquire about his employment status.[3]  Tr. Vol. 2B 53:7-53:24.  Plaintiff located a member of GLWS management, who told Plaintiff to return home to await a letter informing him of his status.  Id. 53:14-53:24.  Plaintiff subsequently received a letter attaching the background report and stating that, based on a background investigation, GLWS found it necessary to reject his employment application.  Id. 58:5-59:4.  Included within the background report were the records of fraud convictions associated with David Oscar Smith.  Id. 62:3-62:12; see also Background Report, Pl. Ex. 6 to Pl. Resp. (Dkt. 41-7).

Plaintiff disputed the criminal record on his report with Defendant and faxed Defendant a copy of his driver's license as proof of identification.  Tr. Vol. 2B 65:8-66:11.  On January 11, 2013, Plaintiff received a letter from Defendant indicating that he had a clean report.  Id. 69:6-

_____

[3] Based on the testimony, it appears that Plaintiff had not seen the email while on vacation.  Tr. Vol. 2B 57:11-57:16.

69:20.  After being out of work for approximately six weeks, Plaintiff began working for GLWS on January 31, 2013 as a delivery driver.  Id. 70:14-70:22.

This suit followed, with Plaintiff claiming lost wages, non-economic damages, punitive damages, and attorney fees.  The jury's verdict included $75,000 in compensatory damages and $300,000 in punitive damages.  Jury Verdict at 2 (cm/ecf page) (Dkt. 35).

## III.   ANALYSIS

Under Rule 50(a), judgment as a matter of law is appropriate only where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue."  Fed. R. Civ. P. 50(a)(1).  The Sixth Circuit has explained how a court should address such motions:

> The evidence should not be weighed, and the credibility of the witnesses should not be questioned.  The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences.

Parker v. Gen. Extrusions, Inc., 491 F.3d 596, 602 (6th Cir. 2007) (quoting Tisdale v. Fed. Express Corp., 415 F.3d 516, 531 (6th Cir. 2005)) (internal quotation marks omitted).  Ultimately, the Court must find that "reasonable minds could come to but one conclusion, in favor of the moving party."  Gray v. Toshiba Am. Consumer Prod. Inc., 263 F.3d 595, 598 (6th Cir. 2001).

For the reasons that follow, the Court concludes that the record contains legally sufficient evidence for a reasonable jury to find for Plaintiff on each of the grounds cited by Defendant in its Rule 50(a) motion.

### A.  Negligence

#### 1.  Standard

FCRA was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007).  Courts read its provisions in harmony with the Congressional intent to create effective remedies for the dissemination of inaccurate consumer information.  Cortez v. Trans Union, LLC, 617 F.3d 688, 721-722 (3d Cir. 2010) ("[T]he breadth and scope of the FCRA is both evident and extraordinary. . . . [I]t is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it.").

FCRA creates a private cause of action when CRAs fail to "follow reasonable procedures to assure maximum possible accuracy" in preparing a consumer report.  15 U.S.C. § 1681e(b).  The inclusion of erroneous information on a consumer's report does not automatically trigger liability; instead, "[l]iability flows only from a 'failure to follow (1) reasonable procedures (2) to assure maximum possible accuracy of the information (3) concerning the individual about whom the information relates.'"  Nelski v. Trans Union, LLC, 86 F. App'x 840, 844 (6th Cir. 2004) (quoting Bryant v. TRW, Inc., 689 F.2d 72, 78 (6th Cir. 1982)).

To succeed on his claim, Plaintiff was required to show that "(1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury."  Id.  "Reasonableness" is defined in "reference to what a reasonably prudent person would do under the circumstances."  Id.  In demonstrating that

Defendant behaved unreasonably, Plaintiff "need not point to specific deficiencies in an agency's practices or procedures." Id. at 845.

### 2.  The evidence at trial

During trial, Plaintiff presented evidence that Plaintiff's name, David Smith, was common. Tr. Vol. 2B 45:11-45:24.  Matthew Brian O'Connor, who had worked for Defendant and is now Vice-President of Operations for First Advantage Corporation (corporate successor to Defendant), testified that Defendant did not have any special procedures in place for dealing with common names, such as Plaintiff's. Tr. Vol. 3 163:25-164:4.  Although Ms. Strawsine testified that GLWS failed to provide Defendant with Plaintiff's middle name in its search request, Tr. Vol. 2B 152:25-153:4, there was also testimony that a middle name, unlike other information, was not required information that Defendant demanded to conduct a search in its proprietary criminal database. Tr. Vol. 3 46:16-46:21, 50:13-50:22.

Notably, Mr. O'Connor testified that Defendant could have required a middle name before running a search through its criminal database. Id. 46:22-47:1.  While Mr. O'Connor testified that a middle name was not a required field — because many people do not have middle names — he agreed that Defendant could have implemented a required field asking whether a legal middle name existed, and, if so, requiring the employer to provide that name. Id. 100:15-101:6.

Additionally, Mr. O'Connor testified that GLWS provided Defendant with Plaintiff's social security number, which Defendant then used to generate Plaintiff's credit report from Equifax. Id. 51:2-51:24.  The credit report listed Plaintiff's middle initial as "A." Id. 52:6-52:19.  Mr. O'Connor testified that Defendant had possession of the Equifax report containing Plaintiff's middle initial at the same time Defendant conducted the criminal background search

within its own database, and before the completed report was sold and transmitted to GLWS.  Id.
52:24-53:7.  The middle initial provided by Equifax did not match the middle name ("Oscar")
listed on the criminal records generated by Defendant's search of its own database.  Id. 53:8-
53:12.  Mr. O'Connor testified that, notwithstanding this discrepancy, Defendant undertook no
steps to determine why the middle initial on the credit report did not match the middle name on
the criminal records.  Id. 54:4-54:8.  Mr. O'Connor testified that, because the middle initial came
from a third-party source (Equifax), and not from Plaintiff or GLWS, Defendant would not have,
as a matter of policy or procedure, incorporated that middle initial into its "verification or
validation process."  Id. 53:16-53:20, 79:9-79:16.  Had GLWS provided Defendant with the
middle name "Alan," however, Mr. O'Connor testified that Defendant would not have matched
or included David Oscar Smith's convictions on Plaintiff's background report.  Id. 80:11-80:16.

### 3.  The parties' arguments

In its supplemental briefing on the oral Rule 50(a) motion, Defendant submits that the
evidence showed that Defendant followed reasonable procedures to assure maximum possible
accuracy of Plaintiff's report.  Def. Supp. Br. at 3-6 (Dkt. 40).  Defendant argues that the errors
contained in Plaintiff's report were the result of limited available data, not unreasonable
procedures.  Id. at 6.  Defendant notes that GLWS failed to provide Defendant with Plaintiff's
middle name, and if Defendant had received the middle name then the criminal record would
have been excluded from Plaintiff's report because the record contained a different middle name.
Id.  Along similar lines, Defendant points out that the bulk data file received from the Florida
repositories, which formed the basis for the information in Defendant's criminal database, did
not contain social security information and, therefore, a match could not be precluded on that
basis.  Id. at 7.

Lastly, Defendant argues that the evidence did not show that it negligently failed to follow reasonable procedures that could have avoided the inaccuracy contained in Plaintiff's report.  Id.  Defendant argues that while "Plaintiff suggested a number of alternative procedures . . . [that] Defendant should have followed[,] . . . the evidence did not show that any of these alternative procedures were reasonable."  Id. at 7-8.  Defendant asserts that the procedures suggested by Plaintiff — requiring, as opposed to requesting, middle names; using the middle initial contained in Plaintiff's credit report to exclude the criminal report as belonging to someone else; and undertaking an additional manual search of criminal records from the Florida Department of Law Enforcement — were each considered and rejected because such procedures "were not reasonable ways to assure maximum possible accuracy in all of its reports."  Id. at 8-9.  Ultimately, according to Defendant, it is incumbent upon Plaintiff "to produce evidence showing that there was some 'reasonable procedure to assure maximum possible accuracy' that Defendant knew about but negligently failed to follow."  Id. at 9.  Defendant submits that Plaintiff has "failed to produce any such evidence; [but] offered mere conjecture."  Id.

In response, Plaintiff emphasizes the factual nature of the reasonableness inquiry, which generally renders such questions unsuitable for judgment as a matter of law.  Pl. Resp. at 4-5 (Dkt. 41).  Plaintiff further submits that the record contains "more than sufficient evidence of Defendant's negligent violation."  Id. at 5.  Plaintiff points to evidence that: (i) Defendant "failed to obtain the best public record of the crimes that it placed on Plaintiff's report," i.e. the Florida Department of Law Enforcement record, which would have conclusively established that the record did not belong to Plaintiff; (ii) Defendant did not require GLWS to provide Plaintiff's middle name; (iii) Defendant failed to use a middle initial contained in other portions of Plaintiff's report to rule out the criminal background; (iv) Defendant "ha[d] no special accuracy-

assuring procedures for consumer background reports involving consumers with very common names"; (v) Defendant did not use social security numbers in searching its database for criminal records, even though the database occasionally links crimes with social security numbers; and (vi) Defendant acknowledged that, had it "obtained either Plaintiff's date of birth or David Oscar Lee Smith's social security number, it would not have placed the inaccurate Florida criminal records on Plaintiff's consumer background report." Id. at 5-6.[4]

Plaintiff also takes issue with Defendant's assertion that he was required to demonstrate alternative procedures that would have both been reasonable for Defendant to undertake and ensured maximum possible accuracy. Id. at 7. In doing so, Plaintiff reviews three different ways in which courts have held that plaintiffs can satisfy their burden under FCRA: (i) offering "evidence beyond an inaccuracy to show that the CRA did not follow reasonable procedures"; (ii) demonstrating that an inaccuracy occurred, thereby shifting the burden to the CRA to demonstrate that it used reasonable procedures; and (iii) "when a plaintiff establishes the existence of an inaccuracy, the jury may, but need not, infer that the defendant failed to follow reasonable procedures." Id. Plaintiff argues that none of the above requires the plaintiff "to produce evidence of some other procedure or identify an alternative procedure that would maximize the possibility of accuracy." Id. at 7-8.

### 4. Discussion

The Court begins with the parties' last arguments — whether Plaintiff was required to provide evidence of the reasonableness of alternative procedures that Defendant should have undertaken — because this issue goes to a fundamental dispute regarding the FCRA-plaintiff's burden. The Court agrees with Plaintiff that he need not proffer specific evidence of the

---

[4] Plaintiff's last argument contains one erroneous premise, because it is undisputed that Defendant had Plaintiff's date of birth. Tr. Vol. 3 46:16-46:19; Tr. Vol. 2B 151:2-151:23. Presumably, Plaintiff meant middle name, not date of birth.

reasonableness of alternative procedures.  Although Defendant cites to a district court case, which found that a plaintiff has "the burden of proving what, at a minimum, would have been reasonable, under the circumstances, including the business costs of any suggested alternative," Perez v. Trans Union, LLC, 526 F. Supp. 2d 504, 509 (E.D. Pa. 2007) abrogated on other grounds by Cortez v. Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010), such a requirement has no support in the Sixth Circuit.  To the contrary, the Sixth Circuit has specifically held that plaintiffs under FCRA need not identify particular deficiencies within a defendant's business practices. Nelski, 86 F. App'x at 845.  If a plaintiff's burden does not include identifying particular deficiencies in the defendant's business practices, then it surely does not include requiring a plaintiff to analyze the costs or other factors bearing on the reasonableness of alternative procedures defendants should have undertaken.

Several decisions by courts in this circuit confirm that a FCRA-plaintiff has no such burden.  For instance, in Nelski, the plaintiff sought relief based on the defendant's failure to delete an erroneous report from a credit history for several months after being notified of the error.  86 F. App'x at 845.  The Sixth Circuit concluded that such a theory, relying as it did on an inference of negligence, would probably survive summary judgment, observing that "a plaintiff need not point to specific deficiencies in an agency's practices or procedures."  Id.  The court's opinion in Nelski nowhere states that the plaintiff had the burden of analyzing the cost of alternative procedures that should have been adopted.

In Morris v. Credit Bureau of Cincinnati, Inc., 563 F. Supp. 962, 963-964 (S.D. Ohio 1983), a case cited approvingly in Nelski, a CRA opened a file on the plaintiff in the name of "Joe T. Morris" and erroneously reported bad debts that belonged to his wife prior to their marriage.  After receiving several denials of credit on that basis, the plaintiff informed the

defendant of the error, and the defendant eventually confirmed the information's inaccuracy and deleted the information from the plaintiff's report.  <u>Id.</u> at 964-965.  After the defendant received notice of the error, a third party requested a report from the defendant for the name of "Joseph T. Morris," and the defendant opened a new file for the request, apparently in the belief that it did not have any information on "Joseph T. Morris."  <u>Id.</u> at 965.  In gathering the information for this new file, the defendant, again, erroneously reported the plaintiff's wife's prior bad debts.  <u>Id.</u> After the plaintiff contacted the defendant once more about the mistake, the defendant learned that it had two open reports on the plaintiff; the two accounts were merged and the inaccurate information was, again, deleted.  <u>Id.</u>  This error occurred on at least one additional occasion.  <u>Id.</u> at 966.  Following a bench trial, the court found that "a reasonably prudent credit reporting agency would have procedures to detect the similarities in the two files that would have prevented further reporting of inaccurate information about [the plaintiff]."  <u>Id.</u> at 968. Specifically, the court commented that "a reasonable investigation would immediately have indicated that Joe T. Morris and Joseph T. Morris were the same person."  <u>Id.</u>  The court did not require the plaintiff to identify or analyze alternative procedures that the defendant should or could have taken, finding instead that "it is not plaintiff's burden to suggest ways in which defendant might improve its operation."  <u>Id.</u>

Still another case in this circuit is <u>Holmes v. Telecheck International, Inc.</u>, 556 F. Supp. 2d 819 (M.D. Tenn. 2008), <u>declined to follow on other grounds by</u> <u>Beaudry v. TeleCheck Serv., Inc.</u>, 579 F.3d 702 (6th Cir. 2009).  In <u>Holmes</u>, the plaintiff introduced evidence that the defendant used two primary identifiers (driver's license number and bank account number) in processing check transactions, but required merchants to provide only one of those two identifiers in requesting a report.  <u>Id.</u> at 835.  Where a merchant provided only one identifier (for

example, the driver's license number), the consumer report would be "limited to the information that [was] stored by [the defendant] based solely on the driver's license number." Id.  The same was true if the merchant provided only the bank account number. Id.  The plaintiff asserted that, by segregating data concerning a particular consumer based on either of those two identifiers, the defendant self-limited the information it provided to merchants, leading to an incomplete consumer report. Id.  The court found this evidence sufficient to create a question of fact as to the reasonableness of the procedures in place. Id.  Notably, the court did not require the plaintiff to engage in any business analysis of would-be alternatives.

These cases not only undercut Defendant's effort to inflate Plaintiff's burden, but they confirm as well Plaintiff's view that a FCRA-plaintiff's burden regarding reasonable procedures is "minimal."  See Philbin v. Trans Union Corp., 101 F.3d 957, 964 (3d Cir. 1996) (quoting Stewart v. Credit Bureau, Inc., 734 F.2d 47, 51 (D.C. Cir. 1984)) abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007).  This minimalist view is confirmed by the varying approaches courts have taken to a FCRA-plaintiff's burden.  As explained in Philbin, there are three leading views: (i) plaintiff must show only "some evidence beyond a mere inaccuracy," (ii) the jury may infer failure to follow reasonable procedures from the mere fact of inaccuracy, and (iii) upon a showing of inaccuracy, the burden shifts to defendant to prove that reasonable procedures were followed.  Id. at 964-965 (citing Stewart, 734 F.2d at 52; Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995); and Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991)).

Under any of these approaches, Plaintiff must prevail on the pending motion.  If the second or third approaches are followed, Plaintiff prevails because Defendant agrees that inaccuracy of the information was established.  And if the first approach is used, Plaintiff must

also prevail, because he submitted evidence going far beyond mere inaccuracy in, at least, two ways.  First, Plaintiff has introduced evidence that other information Defendant received and relied upon from a third-party source, Equifax, created a discrepancy in the report.  A jury could find that, with some reasonable review procedure in place, a reasonable CRA would have discovered the discrepancy between the middle initial in the Equifax credit report ("A.") and the full middle name on the criminal record ("Oscar") and, upon doing so, would have investigated the issue further.  Like in <u>Morris</u>, a reasonable investigation into Plaintiff's middle name would have resolved the discrepancy and avoided the error.

Second, Plaintiff introduced evidence that Defendant did not require its purchasers to submit middle names for a report.  A jury could conclude that a reasonable CRA would have made the middle name a required field when receiving search requests from clients.  Like the CRA in <u>Holmes</u>, which self-limited the information that it sent to merchants, Defendant self-limited the information that it received from employers, thereby reducing the accuracy of the information it subsequently returned to the employer.  Given Mr. O'Connor's testimony that Plaintiff's middle name would have definitively excluded the criminal records as belonging to someone else, a reasonable CRA might have at least required a client to affirmatively indicate whether a consumer had provided a middle name and, if there was one, to provide it to the CRA.

Defendant's arguments to the contrary are not well-taken.  Defendant contends that "there was no evidence to suggest that it would be reasonable for Defendant to use Equifax credit records as identifiers in a search."  Def. Supp. Br. at 8.  Defendant references Mr. O'Connor's testimony that "often a credit record will include multiple names, and that searching for records that match all of those names would increase, rather than decrease, the probability of a report which contains criminal records that do not match the person whose records are ostensibly being

searched." Id.  However, a reasonable jury could conclude that while it may not be reasonable or necessary to use identifiers provided by third parties like Equifax as additional search criteria for criminal records, it is reasonable and necessary for a CRA to investigate obvious discrepancies that appear on a consumer's background report resulting from different information contained within the consumer's criminal history and credit history.  Indeed, Mr. O'Connor testified that Defendant would not resell third-party data, like Equifax's, if it thought the data were inaccurate. Tr. Vol. 3 53:21-54:3.  It is reasonable to conclude that, if Defendant thought the data was reliable enough to sell, then Defendant should have also concluded the data was reliable enough to cast doubt on the criminal records it was including in Plaintiff's report.

Defendant also argues that requiring employers to input a middle name would "have made reports about individuals without middle names impossible to conduct."  Def. Supp. Br. at 8.  But Mr. O'Connor testified that Defendant could create a field inquiring whether the subject consumer had a middle name, and if so, to provide it.  Tr. Vol. 3 100:15-101:6.  Indeed, common sense dictates that because the search inquiry screen already requires certain minimum information, it would not be difficult to modify the middle-name field to require employers to provide the consumer's middle name.  If the employer did not have a middle name for the consumer, it could simply alert Defendant to that effect.

Defendant continues that, even if it was to require middle names, inaccuracies would still occur.  Def. Supp. Br. at 8.  Defendant posits a hypothetical in which "a consumer and a criminal defendant had the same date of birth or same partial social security number, and . . . the consumer's employer provided Defendant with the consumer's first, middle, and last name, but a court record only contained a defendant's first and last name, which matched the consumer's first and last name."  Id. at 8, n.2.  Defendant asserts that it would be in the same predicament as

it was with Plaintiff — namely whether the two individuals were a match and if the criminal record should be reported — but the middle name would be of no assistance. Id. This may be true, but, as Defendant pointed out at trial, FCRA does not require a CRA to eliminate all inaccuracies; it merely requires CRAs to take reasonable steps to ensure "maximum possible accuracy." Requiring employers to provide a middle name may not eliminate all possible mismatches, or instances where Defendant must make a judgment call about whether to report a criminal history as described in the hypothetical above, but it would certainly reduce inaccuracies.[5]

In sum, Plaintiff presented evidence that there were deficiencies in the procedures that Defendant implemented. And given the glaring nature of those deficiencies, a jury could reasonably conclude that they were easily preventable. This was sufficient for Plaintiff to meet his burden of showing that Defendant failed to follow reasonable procedures — a conclusion buttressed by the principle that courts, under FCRA, entrust juries with great latitude in deciding the negligence issue. Guimond, 45 F.3d at 1333 ("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases.").

Accordingly, Defendant's argument regarding negligence is without merit.[6]

---

[5] The Court also observes that this same hypothetical is equally plausible under Defendant's current procedures, which accepts and uses middle names when provided, even though they are not required.

[6] Plaintiff has proposed four additional grounds on which a jury could reasonably find that Defendant behaved negligently. However, as the Court has disposed of Defendant's motion on the two stated grounds, the Court finds it unnecessary to reach Plaintiff's other arguments.

### B. Willfulness

#### 1. Standard

In addition to recovering actual damages for negligent violations of FCRA, consumers may be entitled to punitive damages if they can establish that the defendant willfully violated its obligations under FCRA.  15 U.S.C. § 1681n(a)(2).  In interpreting the term "willfully" with respect to FCRA, the Supreme Court has explained that, "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."  Safeco, 551 U.S. at 57.  The Supreme Court further noted that "the common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  Id. at 68 (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).  Seeing "no reason to deviate from the common law understanding in applying the statute," the Supreme Court held that "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but [also] that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  Id. at 69.

Willfulness can be established when a CRA adopts a general policy or practice that creates an unjustifiably high risk of violating FCRA.  See, e.g., Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 620 (6th Cir. 2012) ("policy prohibit[ing] [] employees from performing anything more than a cursory confirmation of [a consumer's] status before reporting back to a CRA" was evidence of recklessness sufficient to create a genuine dispute precluding summary judgment).  A CRA may also act willfully in connection with a particular transaction.  Seamans v. Temple

Univ., 744 F.3d 853, 868 (3d Cir. 2014) ("A furnisher's objectively unreasonable actions with respect to a particular consumer's account can support a jury finding of willfulness.").

The latter category is illustrated in Adams v. National Engineering Service Corporation, 620 F. Supp. 2d 319, 323-325 (D. Conn. 2009), where the subject report included criminal records belonging to "Debra Adams" and "Debra Jean Adams" for a background investigation concerning "Deborah Adams."  The court noted that "a reasonable jury could find that, in preparing a background investigation report for [plaintiff] which included convictions pertaining to an individual with a different first name from a different state, [defendant] created 'an unjustifiably high risk of harm . . . so obvious that it should [have been] known.'"  Id. at 330 n.7 (alteration in original) (quoting Safeco, 551 U.S. at 68).

### 2.  The evidence at trial

Much of the evidence that Plaintiff presented at trial regarding Defendant's negligence is applicable to Plaintiff's claim for willfulness.  As discussed in detail, supra, Plaintiff put forth evidence showing that Defendant required certain, minimal information before it would prepare a background report or run a search for criminal records in its database, but that it had a policy of not requiring employers to provide a middle name, because not every individual has a middle name.  The evidence also demonstrated that the provision of middle names, where they exist, could be important in ruling out erroneous criminal records, and that Defendant could implement a system by which it required employers to address the existence of a middle name.

### 3.  The parties' arguments

Defendant claims that Plaintiff did not demonstrate that Defendant had the required mental state for recklessness.  Def. Supp. Br. at 11.  Specifically, Defendant argues that: (i) the evidence showed that it belongs to industry groups working toward improving the amount and

quality of data available in the industry; (ii) that Defendant's accuracy rate was on par with or higher than its industry competitors; (iii) that Defendant has a number of incentives to make sure reports are accurate in the first instance; and (iv) that Defendant was not aware of any other reasonable procedures that would make its reports more accurate.  Id.

Defendant further claims that Plaintiff's only evidence on the issue of recklessness was that "during a five year period in which Defendant created some 24 million consumer reports, more than 1,000 consumers contacted Defendant and alleged that their reports contained information about crimes that another person committed, which led Defendant to correct those reports," and that "some of those consumers filed lawsuits against Defendant." Id.  Defendant argues that the evidence did not show that those purportedly inaccurate reports would have been made more accurate by any of Plaintiff's suggested alternative procedures.  Id. at 12.  Moreover, Defendant argues, Plaintiff's evidence did not actually establish that the disputed reports were, in fact, inaccurate, and Defendant's witness, Mr. O'Connor, testified to a number of reasons, other than inaccuracy, as to why the disputed items would have been removed.  Id.

Finally, Defendant argues that Plaintiff failed to show that Defendant knew or should have known that its existing procedures exposed consumers to an unjustifiably high risk of harm. Id. at 13.  Defendant contends that approximately 1,000 disputes out of 24 million reports, and an overall dispute rate of .2%, is not evidence of a high risk of harm, let alone an unjustifiably high risk.  Id.

In response, Plaintiff notes that willfulness is a fact-bound inquiry that courts generally consign for the jury's determination.  Pl. Resp. at 10-11.  In support of his claim for willfulness, Plaintiff points to Defendant's policies of: (i) never requiring middle names before preparing a consumer background report; (ii) never using middle names or initials provided by Equifax to

investigate whether the name of the employment candidate actually matches the middle name for any hits returned from Defendant's database; (iii) never using social security numbers to search for criminal records within its criminal database; and (iv) never obtaining full criminal records from the Florida Department of Law Enforcement absent a specific request by an employer.  Id. at 11-12.

Plaintiff further submits that Defendant's low-dispute-rate defense is a factual one that must be evaluated by a jury, not an argument that entitles it to judgment as a matter of law.  Id. at 12.  Plaintiff continues, however, that the registered disputes Defendant revealed put it on "robust notice of the exact inaccuracy at issue in this case."  Id. at 13.

### 4.  Discussion

In its motion, Defendant places a great deal of weight on Plaintiff's purported failure to demonstrate that Defendant was on notice that its existing procedures, or failure to use additional procedures, exposed Plaintiff and other consumers to an unjustifiably high risk of harm.  However, the Safeco standard of recklessness encompasses an unjustifiably high risk of harm that is either known, or is so obvious that it should have been known.  Safeco, 551 U.S. at 68.  Thus, Defendant need not be on actual notice of the risk of harm if the risk is so obvious that Defendant should have been aware of the unjustifiably high risk.

Here, a jury could reasonably conclude that Defendant's practice of not ever requiring employers to provide consumers' middle names, even where middle names are available, could pose an unjustifiably high risk of harm that was so obvious that Defendant should have been aware of it.  Testimonial evidence established that Plaintiff's name was a common one, and yet Defendant employed no practice or policy to address such an obvious issue.  And when faced with glaring evidence of a mismatch between the credit report — listing a Dave Smith with

middle initial "A" from Michigan — and the criminal records — reflecting Florida convictions for Alabamian David Oscar Smith — Defendant did nothing to clear up this obvious discrepancy. A jury could reasonably find that these deficiencies were not merely "careless," but a disregard of a risk of inaccurate information so obvious that the actions amount to recklessness. Further, given how easily preventable the injury in this case would have been — by requiring a middle name field and/or requiring even minimal follow-up for record discrepancies — a jury could readily find that the risk here was unjustifiably high.

Defendant's arguments about its subjective state of mind are irrelevant. Plaintiff's theory of willfulness was sustainable based on the unjustifiably high risk of inaccuracy of which Defendant should have been aware — not an intentional violation of the law. Thus, Defendant's alleged efforts to improve data accuracy generally by joining industry-wide groups, Defendant's incentives for accuracy, its lack of knowledge of additional reasonable procedures that would have made its reports more accurate, and its relatively low complaint rate are all beside the point. Furthermore, even if Defendant's arguments were relevant, they do not invalidate, as a matter of law, the evidence of willfulness that Plaintiff presented and upon which the jury could base its verdict. A mix of evidence pointing in different directions is precisely the reason the issue of willfulness is generally entrusted to the jury. See, e.g., Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) ("Willfulness under the FCRA is generally a question of fact for the jury."); Hammer v. JP's Sw. Foods, LLC, 739 F. Supp. 2d 1155, 1167 (W.D. Mo. 2010) (same). Here, the jury was entitled to consider the entire mix of evidence in deciding the willfulness issue.

Therefore, the Court finds that Plaintiff presented sufficient evidence on the issue of recklessness to send the claim for willfulness to the jury.[7]

### C. Causation

In its oral Rule 50(a) motion, Defendant requested that judgment be entered in its favor as a matter of law because Plaintiff had failed to demonstrate that Defendant's error was the proximate cause of Plaintiff's harm.  Tr. Vol. 3 114:16-115:24.  Defendant does not address this argument in its supplemental brief, but as it has not been formally withdrawn, the Court addresses it in full.

In its oral motion, Defendant argued that Ms. Strawsine testified that she was aware that Plaintiff's middle name was "Alan," and that the criminal report contained a middle name of "Oscar."  Id. 114:22-114:24.  Defendant reasoned that, despite her knowledge of the discrepancy, Ms. Strawsine made the decision to not hire Plaintiff at the time, although she testified that she could have made a different determination.  Id. 114:24-115:3.  Defendant characterized Ms. Strawsine's decision to "err on the side of caution" and not hire Plaintiff, notwithstanding her uncertainty that the criminal records belonged to him, as a "separate, independent act."  Id. 115:15-115:24.

Plaintiff responded that the standard for causation asks only whether the noncompliance was a substantial factor in the claimed damages; it need not be the only factor or a predominant or prevailing one.  Id. 118:16-118:20.  Plaintiff argued that there was sufficient evidence for the causation question to go to the jury, as Ms. Strawsine testified that felonious convictions for fraud are an outright prohibition for employment with GLWS.  Id. 118:20-119:4; Pl. Resp. at 18-19.

---

[7] Although Plaintiff submits that there are additional policies that could support a jury finding of willfulness, the Court declines to address those policies given the decision above.

In a FCRA case, the plaintiff must demonstrate that "'the alleged FCRA violation was [a] substantial factor in causing the asserted actual damages.'"  Khoury v. Ford Motor Credit Co., LLC, No. 13-11149, 2013 WL 6631471, at *6 (E.D. Mich. Dec. 17, 2013) (alteration in original) (quoting Moore v. First Advantage Enter. Screening Corp., No. 4:12 CV00792, 2013 WL 1662959, at *4 (N.D. Ohio Apr. 17, 2013)).  The fact that some other party made a decision that contributed to a FCRA-plaintiff's harm does not, as a matter of law, eliminate a CRA's liability.  See, e.g., Philbin, 101 F.3d at 969 (holding that credit denial based on multiple reasons does not bar recovery by FCRA-plaintiff, reasoning that "[c]ourts have recognized that where a decision-making process implicates a wide range of considerations, all of which factor into the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of proving that one of those factors was the cause of the decision." (emphasis in original)).

Given Ms. Strawsine's testimony that fraud-related convictions are a bar to employment with GLWS, Tr. Vol. 2B 146:9-146:18, 155:1-155:2, the Court finds that a jury could reasonably conclude that Defendant's error was a substantial factor in causing Plaintiff's injury, notwithstanding Ms. Strawsine's suspicions regarding the accuracy of Defendant's information, id. 153:22-154:4.  Ms. Strawsine specifically testified that she did not consider hiring Plaintiff because of the report, despite the discrepancy, and that Plaintiff would have to contact Defendant to correct the record and reapply before she would reconsider him.  Id. 145:13-145:16, 159:4-159:10.  Because Defendant's actions played a significant role, it is irrelevant that Ms. Strawsine's decision to ignore the discrepancies in the report also played a role in Plaintiff's damages.  Therefore, Defendant's Rule 50(a) motion as to causation is denied.

### D.  Actual Damages

Plaintiff sought actual damages for economic loss, emotional distress, mental anguish, and embarrassment.  The parties stipulated that the amount of the claimed economic loss was $2,640.00, which was based on six weeks of lost pay at the GLWS merchandiser position.  Joint Final Pretrial Order at 5 (Dkt. 38).  The parties' agreed-upon jury instruction regarding actual damages identifies three types of damages: economic loss, harm to reputation, and emotional distress.  Jury Instructions at 20 (cm/ecf page) (Dkt. 37).  The jury ultimately awarded Plaintiff $75,000 in compensatory damages, as well as $300,000 in punitive damages.  Jury Verdict at 2 (cm/ecf page).

In its oral Rule 50(a) motion, Defendant pressed an argument that Plaintiff did not show legally sufficient evidence of damages arising out of wage loss and emotional distress.  Tr. Vol. 3 113:9-114:14; Def. Supp. Br. at 13-17.  In response, Plaintiff argues that, as Defendant's oral Rule 50(a) motion did not request judgment as a matter of law on the issue of damages for reputational harm, Defendant has effectively waived its argument as to all categories of damages. Pl. Resp. at 14, 16.  Specifically, Plaintiff asserts that the evidence as to reputational harm was sufficient to submit the entire question of damages to the jury, making Defendant's arguments regarding wage loss and emotional distress irrelevant.  Id. at 14, 17.  Putting aside the issue of whether the question of damages could be submitted to the jury on the basis of reputational harm alone, the Court determines that there was sufficient evidence in the record on wage loss and emotional distress for a reasonable jury to award damages on those grounds.

### 1. Lost wages

Defendant states that Plaintiff's evidence of lost wages is premised on the wages he would have earned as a GLWS merchandiser, the job he was offered prior to GLWS receiving the erroneous criminal report. Def. Supp. Br. at 14. However, Defendant argues that Plaintiff's testimony during trial that he would have accepted the merchandiser position is inconsistent with his deposition testimony on the same subject. Id. Defendant cites to Plaintiff's deposition testimony in which Plaintiff stated that he would not have accepted the merchandiser position because he believed that one could not perform the job requirements and still make a living at the offered wage. Id. Defendant dismisses Plaintiff's trial testimony that he would have accepted the merchandiser position as not credible and unsupported by the evidence. Id. at 15.

In response, Plaintiff points to trial testimony that he could not afford to be out of work, and that he would have accepted the merchandiser position had no driver position been available. Pl. Resp. at 19.

Plaintiff did testify that he would have accepted the merchandiser position had no driver position been available. Tr. Vol. 2B 50:25-51:5. Far from not being supported by the evidence, as Defendant asserts, Plaintiff's testimony is evidence. Furthermore, when evaluating a Rule 50(a) motion, it is not the province of the court to judge the credibility of the witnesses or weigh the evidence. Parker v. Gen. Extrusions, Inc., 491 F.3d 596, 602 (6th Cir. 2007). Accordingly, the Court finds that there was sufficient evidence to submit the issue of wage loss to the jury.

### 2. Emotional Distress

Defendant argues that Plaintiff's emotional distress claim should not have been submitted to the jury for two reasons. First, Plaintiff's purported emotional distress stemmed not from being mistaken for a criminal, but from his financial difficulties; in Defendant's view, Plaintiff

and his wife would have experienced the same difficulties — even if the report had not been erroneous — because the merchandiser position paid far less than what they needed in order to make ends meet.  Def. Supp. Br. at 15-16.  Second, Defendant argues that Plaintiff's testimony concerning his emotional distress consisted solely of conclusory statements that render a claim for emotional distress insufficient as a matter of law.  Id. at 16.

Plaintiff responds that he "needed only to present sufficient evidence to allow a reasonable jury to conclude that a causal link existed between Defendant's FCRA violation and his emotional distress."  Pl. Resp. at 20.  Plaintiff further argues that his testimony and his wife's testimony were legally sufficient for a jury to award damages on the basis of emotional distress. Id. at 21.

As to Defendant's first argument — whether Plaintiff would have experienced the same emotional distress concerning his financial situation absent Defendant's error — such a question involves weighing the evidence and evaluating the credibility of witnesses.  The Rule 50(a) standard prohibits the Court from engaging in such an evaluative inquiry.  Plaintiff testified that his inability to work, because of the erroneous background report, caused Plaintiff emotional distress.  Tr. Vol. 2B 69:4-69:5, 109:4-109:11.  What weight should be given to that testimony, in light of the Smith family's financial considerations and the pay rate for the merchandiser position, is a task for the jury, not this Court.

As to Defendant's second argument, the Sixth Circuit has explained the standard for awarding damages on the basis of emotional distress:

> An injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements.

Bach v. First Union Nat'l Bank, 149 F. App'x 354, 361 (6th Cir. 2005).  In Bach, the plaintiff testified that the denial of her mortgage application (the alleged injury) "made her feel 'desperate,' 'ashamed,' 'embarrassed,' and 'damn mad.'"  Id.  The court also found that the plaintiff was particularly vulnerable at the time of her injury because she had recently suffered a stroke and, consequently, had limited ability to function and care for herself.  Id. at 361-362.  Ultimately, the Sixth Circuit concluded that the plaintiff had "presented sufficient evidence from which the jury could reasonably conclude that [she] was entitled to actual damages in the form of pain and suffering."  Id. at 362.

In the present case, Plaintiff testified that he was unsure whether the error regarding his criminal background would be corrected and whether GLWS would even hold an offer of employment open while Defendant looked into the error.  Tr. Vol. 2B 67:3-67:17.  Plaintiff also stated that he had a number of bills due at the end of the month, including heating costs for the coldest months of the year; Plaintiff also referenced a concern that the electricity could be shut off if it was not paid.  Id. 67:22-68:4.  Plaintiff testified that he had to borrow money from his parents and his sister in order to make those payments, and that he felt ashamed for having to do so.  Id. 68:5-68:11.  Plaintiff also stated that he came from a small town and people were aware of his situation; one person referred to Plaintiff as his "favorite felon," in front of a crowd of people.  Id. 74:12-75:1.  Plaintiff also testified that he did not know how he was going to make a living, and that he was depressed.  Id. 109:4-109:11.

Plaintiff's wife testified that the family missed a mortgage payment, and that they were unsure if they would have to pay penalties associated with the missed payment.  Id. 131:15-132:2, 132:23-133:7.  The Smiths also were unsure whether they could make their car payment and whether their car would be repossessed.  Id. 132:23-133:7.  Mrs. Smith testified that these

27

concerns made this period the most stressful of their marriage.  Id. 133:8-133:11.  Mrs. Smith also testified that her husband was angry about being unable to pay the bills, short with her, and depressed.  Id. 132:8-132:10.  The record also established that the Smith family was financially vulnerable and could not afford to be out of work, id. 51:6-51:10, 125:4-125:19, and that Plaintiff struggled to find another job, id. 68:12-69:5.  Given this evidence, the Court concludes that the testimony from Plaintiff and his wife "reasonably and sufficiently explains the circumstances surrounding the injury."  See Bach, 149 F. App'x at 361.

Defendant's reference to Moore v. First Advantage Enterprise Screening Corporation, another case within this circuit concerning emotional damages, is not persuasive.  First, Moore does not cite Bach, or any other Sixth Circuit case regarding the standard for emotional damages.  See Moore, No. 4:12 CV00792, 2013 WL 1662959, at *4-5 (N.D. Ohio Apr. 17, 2013).  Furthermore, Moore finds that testimonial evidence, in the absence of other tangible proof, such as medical treatment or counseling, is insufficient to establish emotional distress.  Id.  This appears to be in tension with existing Sixth Circuit precedent as articulated in Bach, and therefore the Court declines to follow its reasoning.  Consequently, the Court finds that Plaintiff presented sufficient evidence to submit his claim for emotional distress to a jury.

### IV.   CONCLUSION

For the foregoing reasons, Defendant's Rule 50(a) motion is denied.

s/Mark A. Goldsmith
MARK A. GOLDSMITH
UNITED STATES DISTRICT JUDGE

Dated: December 30, 2014

<u>CERTIFICATE OF SERVICE</u>

     The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 30, 2014.

                                     s/Deborah Tofil

                                     Deborah Tofil

                                     Case Manager