UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ALAN SMITH,

              Plaintiff,                               Civil Action No. 13-CV-10774

vs.                                         HON. MARK A. GOLDSMITH

LEXISNEXIS SCREENING
SOLUTIONS
INC.,

              Defendant.

_____/

**OPINION AND ORDER (1) DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (Dkt. 57) AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR NEW TRIAL AND/OR REMITTITUR (Dkt. 57)**

## I. INTRODUCTION

Plaintiff David Alan Smith agreed to submit to a background investigation check upon applying for a job with Great Lakes Wine & Spirits ("GLWS"). GLWS contracted with Defendant LexisNexis Screening Solutions, Inc. to prepare that background report. Unfortunately, the background report Defendant provided to GLWS contained a critical — and undisputed — error. Specifically, the background report contained records of fraud-related convictions belonging to David Oscar Smith, an individual whom both parties agree is not Plaintiff David Alan Smith. Upon receiving that report, GLWS withdrew a previous offer of employment.

The erroneous report led Plaintiff to file suit against Defendant pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., which applies to consumer reports like the background investigation at issue here. FCRA requires, in part, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure

1

maximum possible accuracy of the information concerning the individual about whom the report relates." Id. § 1681e(b).  Plaintiff alleges that Defendant both negligently and willfully failed to comply with this mandate, and that the consequent error cost him six weeks of lost wages, in addition to considerable reputational and emotional injury.  A jury agreed, and found Defendant liable for $75,000 in compensatory damages and $300,000 in punitive damages.

Before the case was submitted to the jury, Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  The Court took Defendant's motion under advisement and submitted the matter to the jury, subject to a later decision on the motion. After the jury returned a verdict, the Court ordered supplemental briefing on Defendant's motion, and then issued a written opinion explaining its decision to deny that motion.

Presently, Defendant has renewed its motion for judgment as a matter of law — now pursuant to Rule 50(b) — and, in the alternative, moves for a new trial and/or remittitur under Rule 59 (Dkt. 57).  Plaintiff filed a response (Dkt. 59), to which Defendant filed a reply (Dkt. 60).  Oral argument was heard on June 4, 2015.

For the reasons discussed fully below, the Court denies Defendant's renewed motion for judgment as a matter of law.  The Court grants Defendant's motion for a new trial and/or remittitur, in part, and orders the punitive damages award be reduced from $300,000 to $150,000.  The remainder of Defendant's motion for a new trial and/or remittitur is denied.[1]

## II.  DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

FCRA is not a strict liability statute.  Nelski v. Trans Union, LLC, 86 F. App'x 840, 844 (6th Cir. 2004).  While a showing of inaccuracy is an essential element of a § 1681e(b) claim, a

---

[1] The factual background underlying this case was set forth in the Court's opinion and order denying Defendant's Rule 50(a) motion for judgment as a matter of law and need not be repeated here.  See Smith v. LexisNexis Screening Solutions, Inc., 76 F. Supp. 3d 651, 654-656 (E.D. Mich. 2014).

FCRA plaintiff must allege and prove more to establish the <u>prima facie</u> case: "(1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury." <u>Id.</u>  Reasonableness is measured against "what a reasonably prudent person would do under the circumstances." <u>Id.</u>

Like its Rule 50(a) motion, Defendant's renewed motion challenges the sufficiency of Plaintiff's evidence to the jury on the issues of negligence, willfulness, and compensatory damages.  The Court's review for sufficiency of the evidence is limited:

> The evidence should not be weighed, and the credibility of the witnesses should not be questioned.  The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences.  The motion should be granted . . . only if reasonable minds could not come to a conclusion other than one favoring the movant.

<u>Tisdale v. Fed. Express Corp.</u>, 415 F.3d 516, 531 (6th Cir. 2005) (quoting <u>Williams v. Nashville Network</u>, 132 F.3d 1123, 1130-1131 (6th Cir. 1997)).

Applying this standard — the same standard that applied to the earlier motion under Rule 50(a) — the Court reaches the same conclusion now that it reached in its prior decision: there was sufficient evidence for a reasonable jury to find in favor of Plaintiff on the issues of negligence, willfulness, and compensatory damages.

**A.  Plaintiff Presented Sufficient Evidence on Defendant's Negligence**

**1.  Plaintiff's Evidentiary Burden**

In its Rule 50(a) motion, Defendant argued, in part, that Plaintiff needed to present specific evidence — such as an analysis of business costs — to establish the reasonableness of

alternative procedures that Defendant knew about, but negligently failed to follow.  Smith v. LexisNexis Screening Solutions, Inc., 76 F. Supp. 3d 651, 658-659 (E.D. Mich. 2014).  The Court rejected that argument, observing that courts in the Sixth Circuit have actually indicated the opposite — that a FCRA plaintiff does not need to present such evidence.  Id. at 659-660. The Court also stated that this was supported by out-of-circuit opinions, as well.  Id. at 660.

In its current motion for judgment as a matter of law, Defendant attempts to refine its argument by contending that FCRA establishes different prima facie cases — based on whether the credit reporting agency ("CRA") has been put on notice of a "problem" by a potential plaintiff.  See Def. Br. at 1-3.  According to Defendant, if the CRA has been put on notice of a problem and fails to correct it, then no specific evidence of reasonable alternatives must be submitted by the plaintiff; however, if the CRA has not been put on notice, then such specific evidence of reasonableness is required.  Id.  In response, Plaintiff argues that nothing in the statute or the applicable case law requires a FCRA plaintiff who challenges the reasonableness of a defendant's procedures to demonstrate that a defendant had notice of a problem.  Pl. Br. at 4-5.

The Court rejects Defendant's argument for several reasons.  For one thing, Defendant's argument would be inconsistent with FCRA's structure, which created a separate provision for a CRA's failure to investigate a potential inaccuracy drawn to its attention, see 15 U.S.C. § 1681i (the so-called "reinvestigation" provision), which is distinct from the general provision to follow reasonable procedures in preparing consumer reports, id. § 1681e(b).  Because Congress saw fit to establish a separate provision for cases where a CRA had notice of a problem, it would be plainly unreasonable to interpret the statute as mandating a different prima facie case for a CRA with notice when a claim is brought under § 1681e(b).

4

Moreover, Defendant's argument would be inconsistent with numerous cases — both in and out of the Sixth Circuit — which have rejected the imposition of any burden on a FCRA plaintiff to supply evidence of the reasonableness of alternative procedures.  See Nelski, 86 F. App'x at 845 ("Generally, a plaintiff need not point to specific deficiencies in an agency's practices or procedures."); Morris v. Credit Bureau of Cincinnati, Inc., 563 F. Supp. 962, 968 (S.D. Ohio 1983) ("[I]t is not plaintiff's burden to suggest ways in which defendant might improve its operation."); Stewart v. Credit Bureau, Inc., 734 F.2d 47, 52 (D.C. Cir. 1984) ("[A] plaintiff need not introduce direct evidence of unreasonableness of procedures: In certain instances, inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures, and . . . in such instances plaintiff's failure to present direct evidence will not be fatal to his claim."); Wilson v. CARCO Grp., Inc., 518 F.3d 40, 42-43 (D.C. Cir. 2008) (rejecting an expert-testimony requirement on the issue of reasonable procedures, as foreclosed by Stewart's holding that direct evidence of reasonable procedures is not always necessary); Parker v. Parker, 124 F. Supp. 2d 1216, 1224-1225 (M.D. Ala. 2000) (plaintiff need not introduce direct evidence of unreasonableness of procedures (citing Stewart)); Eller v. Experian Info. Solutions, Inc., No. 09-CV-00040-WJM-KMT, 2011 WL 3365955, at *7 (D. Colo. May 17, 2011) ("While Plaintiff has not specified how Trans Union failed to follow reasonable procedures, he need not point to specific deficiencies in Trans Union's procedures."), report adopted on other grounds by 2011 WL 3365513 (D. Colo. Aug. 4, 2011).   And the principle that a plaintiff need not show reasonable alternatives has been applied even in cases that do not involve the reappearance of errors.  See Stewart, 734 F.2d at 52 (observing that "inconsistencies within a single file or report . . . can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information," where the plaintiff pointed to a wage-earner plan entry that was "facially

inconsistent with the rest of his file"); <u>Wilson</u>, 518 F.3d at 40-41 (reversing grant of summary judgment, which had been based on the plaintiff's failure to supply expert testimony on reasonableness, where reporting error involved criminal convictions belonging to someone other than the plaintiff, but no claim that CRA had been previously notified of this problem).

Defendant purports to distinguish the cases cited by the Court in its earlier decision by claiming they all involve repeated errors of which the defendants in those cases had notice.  Def. Br. at 1-2.  While that may be true, what Defendant ignores is that those courts never articulated the two-tier <u>prima-facie</u>-case rule that Defendant advances.  Notably, the Third Circuit's widely cited decision in <u>Philbin v. Trans Union Corp.</u>, 101 F.3d 957, 963-966 (3d Cir. 1996), <u>abrogated on other grounds by</u> <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. 47 (2007), which thoroughly analyzed the different approaches some courts have employed in describing a FCRA plaintiff's burden, did not describe any rule along the lines urged by Defendant.

In fact, cases have expressly rejected Defendant's argument.  <u>See</u> <u>Dively v. Trans Union, LLC</u>, No. 11-3607, 2012 WL 246095, at *3-4 (E.D. Pa. Jan. 26, 2012) ("No Third Circuit court has held that a plaintiff must prove that a CRA had notice of an inaccuracy and failed to act before it can be held liable under § 1681e(b)."); <u>Robertson v. Experian Info. Solutions, Inc.</u>, No. 1:CV-09-0850, 2010 WL 1643579, at *4 (M.D. Pa. Apr. 22, 2010) (fact that defendant did not know of inaccuracy until after notified by consumer "is irrelevant" to the analysis of whether the plaintiff could survive summary judgment); <u>O'Connor v. Trans Union Corp.</u>, No. CIV. A. 97-4633, 1999 WL 773504, at *4 (E.D. Pa. Sept. 29, 1999) ("[T]he Third Circuit never held that in order to satisfy a prima facie case under § 1681e(b) . . . a plaintiff must show that the defendant had prior notice of the inaccuracies from the consumer.").

Defendant relies on <u>Sarver v. Experian Information Solutions</u>, 390 F.3d 969, 970, 972 (7th Cir. 2004), where summary judgment was affirmed in favor of a CRA, which had included a record from a reliable source (there, a financial institution) that had inaccurately stated that the plaintiff had been involved in a bankruptcy.   <u>Sarver</u> stated that a CRA should not be held "responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures."   <u>Id.</u> at 972.   But the problem in <u>Sarver</u> was entirely the fault of the financial institution that had been accessed by the CRA.   Here, Defendant did not simply reproduce information received from a third-party about Plaintiff that already contained an error; Defendant itself generated the error, by placing the criminal history of a different Alan Smith on Plaintiff's background report.   There was nothing incorrect about the individual criminal records — they just did not belong to Plaintiff.   Whether, and under what circumstances, it is reasonable to rely on the accuracy of information provided by a third party is irrelevant to whether a CRA used reasonable procedures in searching for and selecting criminal information to include on a background report.   <u>See</u> <u>Adams v. Nat'l Eng'g Serv. Corp.</u>, 620 F. Supp. 2d 319, 334 (D. Conn. 2009) ("[W]hile requiring a [CRA] to 'go beyond the face of court records to determine whether [those records] correctly report the outcome of the underlying action' may be too much to ask, requiring a [CRA] to correctly determine which public records belong to which individual consumers is not.").[2]

---

[2] <u>Sarver</u> is distinguishable for two other reasons.  Here, unlike the plaintiff in <u>Sarver</u>, Plaintiff did present additional evidence regarding the reasonableness of Defendant's procedures that the jury was entitled to consider.  Moreover, <u>Sarver</u>'s notice-requirement would appear to run up against the Sixth Circuit's standard for reasonableness; in certain circumstances, it may not be reasonable to simply relay certain consumer information on a credit report, notwithstanding the reputability of the source.  <u>See, e.g.</u>, <u>Stewart</u>, 734 F.2d at 52.

The other cases Defendant relies on are similarly distinguishable. In <u>Henson v. CSC Credit Services</u>, 29 F.3d 280, 282 (7th Cir. 1994), the court upheld the dismissal of a FCRA claim based on an inaccurate court document, which had recited inaccurately that a money judgment had been entered against the plaintiff. The <u>Henson</u> court held that a CRA could rely on a court document, absent some notice from the plaintiff that it was inaccurate. <u>Id.</u> at 285. As in <u>Sarver</u>, the problem in <u>Henson</u> was caused entirely by the inaccuracy of a generally reputable source of information. The problem was not caused, as it was here, by the decision of the CRA to place that information in the report of the plaintiff.[3]

Accordingly, the Court rejects Defendant's argument that Plaintiff had to prove the reasonableness of proposed alternative procedures to ensure maximum accuracy.

---

[3] Defendant's citation to <u>Perez v. Trans Union, LLC</u>, 526 F. Supp. 2d 504, 509 (E.D. Pa. 2007), <u>abrogated on other grounds by</u> <u>Cortez v. Trans Union, LLC</u>, 617 F.3d 688 (3d Cir. 2010), for the proposition that Plaintiff has the burden of establishing the reasonableness of proposed procedures is not apt, given that the statement was cursory, without a supporting citation, and entirely dictum.

A new case brought to the Court's attention by Defendant in its Notice of Supplemental Authority (Dkt. 69) adds no force to its argument. In <u>Childress v. Experian Information Solutions, Inc.</u>, 790 F.3d 745 (7th Cir. 2015), the court affirmed summary judgment in favor of the CRA, which had stated in its report that a bankruptcy had been "dismissed," when it had been voluntarily withdrawn. The court gave alternative grounds for its decision. It held that there really was no inaccuracy, because when a case is withdrawn it is also dismissed. <u>Id.</u> at 747. That holding makes the case distinguishable from ours, where it is undisputed that the report here was inaccurate. Another holding was that the plaintiff was basing her claim of failing to follow reasonable procedures on the CRA's failure to review every bankruptcy dismissal to determine if it stemmed from a voluntary withdrawal of the petition. <u>Id.</u> Given that the undertaking would have been massive, and given that FCRA actually implies that the consumer would furnish notice to the CRA of voluntary withdrawal, the court found that the plaintiff had not shown that her theory was a reasonable one. <u>Id.</u> The court, however, only mentioned, in a terse fashion, and without citation of authority, that the plaintiff had the burden to establish the reasonableness of her proposed procedure. <u>Id.</u> Given that the plaintiff sought to establish reasonableness in a way that varied from the procedure seemingly mandated by FCRA, and given the court's cursory statement on the plaintiff's burden, this Court does not find <u>Childress</u> persuasive authority for departing from the weight of authority on this issue.

### 2.  The Evidence Presented at Trial

In its prior decision, the Court concluded that Plaintiff had presented evidence of negligence, beyond mere inaccuracy, in at least two ways: (i) there was an internal discrepancy within Plaintiff's report at the time Defendant issued it to GLWS; and (ii) Defendant self-limited the information it received from clients by failing to make the middle-name field of its submission form a mandatory field.  Smith, 76 F. Supp. 3d at 660-661.

Defendant takes issue with each of these points on the basis that Plaintiff did not show that Defendant "had notice of a problem, or that alternative procedures were reasonable."  Def. Br. at 4.  As explained above, Plaintiff was not required to show that Defendant was on notice of a problem or inaccuracy, or provide specific evidence of the reasonableness of procedures; thus, to the extent Defendant argues that Plaintiff's evidence falls short on those grounds, those arguments are irrelevant.  The Court further stands by its original determination that Plaintiff presented additional evidence beyond an inaccuracy that would allow a jury to infer that Defendant was negligent.

While Defendant argues that "the evidence did not show that 'some reasonable review' would have discovered the discrepancy" contained within Plaintiff's background report, id. at 5, whether a "reasonable" review would have uncovered the discrepancy is a factual determination for the jury.  And a jury could conclude that a review of the report would have uncovered the discrepancy between the middle names and places of residence, and led a reasonable person to question the results.  See Background Report, Pl. Ex. 6 to Pl. R. 50(a) Supp. Br. (Dkt. 41-7).[4]

---

[4] When asked whether the fact that the criminal history referred to crimes committed in Florida made her suspicious of the accuracy of the information, Vicki Strawsine, human resources director for GLWS, testified that it did.  Tr. Vol. 2B 153:19-153:25 (Dkt. 47).  While certainly not dispositive, Ms. Strawsine's own suspicion suggests that a jury could find a reasonable person in similar circumstances — that is, when faced with a background report containing

Courts have routinely found that internal discrepancies are sufficient to raise an issue of fact for the jury.  Stewart, 734 F.2d at 51-52; Gohman v. Equifax Info. Servs., LLC, 395 F. Supp. 2d 822, 827-828 (D. Minn. 2005) (notation of accountholder's death, which was inconsistent with remainder of consumer's file, could lead jury to infer absence of reasonable procedures); McKeown v. Sears Roebuck & Co., 335 F. Supp. 2d 917, 930 (W.D. Wis. 2004) ("Other courts have recognized that receiving inconsistent information may trigger a duty on the part of the [CRA] to investigate."); Sheffer v. Experian Info. Solutions, Inc., No. CIV.A. 02-7407, 2003 WL 21710573, at *2 (E.D. Pa. July 24, 2003) (internal inconsistencies, such as account opening prior to consumer's date of birth and a deceased notation on just one, out of many, accounts, permit jury to infer procedures were unreasonable); Jones v. Credit Bureau of Greater Garden City, Inc., No. 87-1302-C, 1989 WL 107747, at *7 (D. Kan. Aug. 28, 1989) (conflict in addresses should have alerted CRA to potential inaccuracies).   Cf. Morris, 563 F. Supp. at 968 (rejecting defendant's argument that it had no way of knowing that two files containing a similar name concerned the same person, because defendant should have had a procedure in place that would have detected the similarities in the files, which should prompt a reasonable investigation).

Defendant further states that it does not compare its records with that of third parties because third parties often return multiple names or variations thereof.  Def. Br. at 5-6.  Because discrepancies are common, it would not be reasonable to investigate every one of them.  Id. at 6.[5]

Defendant's argument carries troubling implications.  Under Defendant's theory, it is absolved from maintaining reasonable procedures for ensuring a consumer report's accuracy

---

potentially anomalous and contradictory information — would also be suspicious of the report's accuracy.

[5] Notably, Defendant does not suggest that it would be unreasonable to put in place a procedure to catch such discrepancies, only that it would be unreasonable to require Defendant to review each one.

simply because there are numerous opportunities for potential inaccuracy.  See McKeown, 335 F. Supp. 2d at 931 ("Defendant Equifax's argument is that in light of the procedures it uses, it is not surprising that the inconsistency went unnoticed.  This is hardly a compelling argument.  The relevant issue is whether it is reasonable for defendant Equifax to rely on procedures that do not detect this kind of inconsistency.").  The animating purpose behind FCRA is to prevent in the first instance, and to protect consumers from, "the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."  Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995).  This is especially true with respect to information concerning an individual's reputation, personal characteristics, or character more generally, which may necessitate a greater level of care due to the sensitive and subjective nature of the information being conveyed.  See Bryant v. TRW, Inc., 689 F.2d 72, 78 (6th Cir. 1982).  Accordingly, FCRA must be read in a liberal manner consistent with its goal.  See id. at 77-78; Cortez v. Trans Union, LLC, 617 F.3d 688, 721-722 (3d Cir. 2010) (FCRA is "undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it.").  In light of this purpose, the statute cannot be viewed to tolerate as "reasonable" a CRA's failure to take action simply because discrepancies are too numerous.

Defendant also argues that while one might assume common names carry an increased risk of inaccuracy, such that it should have procedures in place to address that risk, "the law requires evidence, not assumptions."  Def. Br. at 5.  And while it is true, as Defendant suggests, that using the same basic procedure for each report may not speak to the reasonableness of a CRA's procedures, id., a jury could determine that it is unreasonable to use the same basic procedure for each report.  Furthermore, a jury is permitted to apply its common sense and draw

11

on its own real-world experiences in reaching its conclusions.  E.g. United States v. Jones, 580 F.2d 219, 222 (6th Cir. 1978) ("[J]ury may properly rely upon its own knowledge and experience in evaluating evidence and drawing inferences from that evidence . . . ."); United States v. DiMarzo, 80 F.3d 656, 661 (1st Cir. 1996) ("As we repeatedly have recognized, a jury is free to rely on its common sense . . . ."); United States v. Tin Yat Chin, 275 F. Supp. 2d 382, 384 (E.D.N.Y. 2003) ("Jurors are permitted and expected to bring to their deliberations common knowledge drawn from their life experiences.").  Thus, it is entirely appropriate for a jury to infer that individuals with common names carry a higher risk that information belonging to others with the same name will be mistakenly attributed to them, and that a reasonable person would take steps to reduce that risk.

Along those same lines, Defendant asserts that the evidence did not show that a reasonable CRA would have made a middle-name field mandatory when receiving report requests from clients.  Def. Br. at 7.  However, the evidence showed that Defendant required a certain amount of information before generating reports, and that addressing a middle name was not one such piece of information.  Given the importance Matthew O'Connor, Vice-President of Operations for First Advantage Corporation (corporate successor to Defendant) and testifying on behalf of Defendant, placed on the use of Plaintiff's middle name to rule out the criminal history as belonging to him, a jury could infer that a reasonable CRA would require a client to address the existence of a middle name, and that such a field would be reasonable to implement.[6]  Cf. Fahey v. Experian Info. Solutions, Inc., 571 F. Supp. 2d 1082, 1091 (E.D. Mo. 2008) (reasonable jury could conclude that a CRA's "reporting procedures were unreasonable, inasmuch as it failed

---

[6]  Mr. O'Connor testified that Defendant could create a field that would account for circumstances where the subject failed to give a middle name or otherwise did not have one.  Tr. Vol. 3 100:15-101:6 (Dkt. 48).

to require sufficient identifying information about a consumer before listing accounts on his or her credit report.").

When a FCRA plaintiff identifies potential weaknesses in a CRA's procedures that may be improved upon, courts typically find that the plaintiff has raised an issue of fact for the jury. See Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 416-417 (4th Cir. 2001) ("A jury could properly conclude that it was an unreasonable procedure to rely on a clerk's informal opinion on the crucial question of whether a specific crime is a felony and that [the defendant] should have had procedures in place to instruct its subvendors on the appropriate sources for reliable information about a person's criminal record."); Graham v. CSC Credit Servs., Inc., 306 F. Supp. 2d 873, 878 (D. Minn. 2004) (reasonableness of the defendant's procedures for tracking sources of information it receives raises issue of material fact); Jones, 1989 WL 107747, at *7 ("Defendants' transfer of information from one debtor's credit file into another debtor's credit file is undoubtedly a serious and significant act which calls for more precautions than a similarity of names.").

Finally, Defendant contends that its low dispute rate indicates that its reports are highly accurate, Def. Br. at 8, presumably suggesting that highly accurate reports are indicative of reasonable procedures. This may be true, but Defendant's dispute rate is merely another piece of evidence that a jury, and not the Court, is entitled to weigh and consider.

Indeed, because reasonableness is so often dependent on the factual context in which it is presented, "each [case] must be judged on its own merits." Bryant, 689 F.2d at 78. Due to the intensely factual nature of the inquiry, courts routinely observe that it will be a jury question in "the overwhelming majority of cases." Guimond, 45 F.3d at 1333; see also Dalton, 257 F.3d at 416 (same); Boris v. Choicepoint Servs., Inc., 249 F. Supp. 2d 851, 856 (W.D. Ky. 2003) (same).

As one court has observed, "courts considering claims for negligent violation of the FCRA have manifested extreme reluctance to grant summary judgment to credit reporting agencies on claims that they failed to follow reasonable procedures to ensure maximum possible accuracy." McCauley v. Trans Union LLC, No. 02 Civ. 4042(VM), 2003 WL 22845741, at *2 (S.D.N.Y. Nov. 26, 2003).

The Court shares a similar reluctance to displace the jury's verdict on the negligence issue, and, accordingly, will allow it to stand.

## B.  Plaintiff Presented Sufficient Evidence on Defendant's Recklessness

In its Rule 50(a) decision, the Court concluded that a jury could find that Defendant's policy of never requiring clients to provide middle names, even where available, posed an unjustifiably high risk of harm that was so obvious Defendant should have been aware of it. Smith, 76 F. Supp. 3d at 664.  The Court further determined that a failure to address a glaring discrepancy within Plaintiff's report permitted a jury to conclude that Defendant's actions created a risk of inaccurate information so obvious that it went beyond careless.  Id.

Defendant argues that there are two problems with this analysis: (i) the Supreme Court's Safeco decision suggests that punitive damages should not be imposed under FCRA absent "some authoritative guidance which suggested that what [the defendant] was doing — its 'reading' of the statute — was mistaken"; and (ii) Plaintiff never demonstrated how easily preventable the error here was, because he did not show that Defendant was on notice of systemic problems with its procedures or that alternative procedures were reasonable.  Def. Br. at 9-10.

Defendant's first point is premised on the fact that the Supreme Court took into consideration the lack of guidance on the meaning or applicability of a particular FCRA

14

provision, in addition to the less-than-clear statutory text, to determine that the defendant's "reading [of the statutory language] was not objectively unreasonable, and so [fell] well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 70 (2007).  Defendant argues that it should not be liable for punitive damages because case law regarding § 1681e(b) violations involve repeated instances of inaccurate information in a report, and, outside that context, courts do not require consumer reports to be individually examined for anomalous information and subsequent investigation. Def. Br. at 10.

In Safeco, the defendant's liability turned on whether certain conduct fell within the scope of FCRA, which in turn depended on the meaning of certain statutory text, i.e., a question of law.  Safeco, 551 U.S. at 60-67.  The Supreme Court determined that the conduct in question did fall within the scope of the statute, but observed that the defendant's reading had a sufficient foundation in the statutory text and was also persuasive enough to have succeeded at the district court level; it further added that no authoritative guidance was available to warn the defendant against the interpretation it adopted.  Id. at 69-70.  Accordingly, the Supreme Court concluded that the defendant's interpretation of the statute was not objectively unreasonable, let alone one that ran an "unjustifiably high risk" of recklessly violating the statute.  Id. at 70.

The circumstances presented here are markedly different.  Whereas liability in Safeco was premised on a question of law, Defendant's liability depends on whether it maintained reasonable procedures to assure maximum possible accuracy — a question of fact, largely reserved for a jury.  This fundamental distinction supports the view that the Supreme Court in Safeco did not purport to create a rule that only where a CRA disregarded authoritative guidance on the interpretation of the statute could its actions be deemed reckless.  Such a rule would

almost certainly remove the question of recklessness from the hands of the jury, as questions of authoritative guidance and statutory meaning are often deemed to be within the province of the courts.  Reasonableness of procedures, and the failure to adopt or follow them, is open to interpretation in a different, fact-dependent way, such that courts prefer to let juries come to the ultimate conclusion on that point.  E.g. Wilson v. Prudential Fin., No. 03-2313(RMU), 2004 WL 2451412, at *5 (D.D.C. Oct. 18, 2004) (collecting cases that take note of a jury's uniquely suited role in cases involving questions of negligence or reasonableness); see also Miller v. Johnson & Johnson, Janssen Pharm., Inc., 80 F. Supp. 3d 1284, 1296 (M.D. Fla. 2015) ("Moreover, the question of whether an employer acted willfully or negligently [under FCRA] 'is understood to be a question of fact for the jury.'" (quoting Cowley v. Burger King Corp., No. 07-21772-CIV, 2008 WL 8910653, at *4 (S.D. Fla. May 23, 2008))); Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) ("Willfulness under the FCRA is generally a question of fact for the jury."); Hammer v. JP's Sw. Foods, L.L.C., 739 F. Supp. 2d 1155, 1167 (W.D. Mo. 2010) (same).

The most salient aspect of the Safeco decision for the present factual question is the standard for recklessness to prove a willful violation: "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  Safeco, 551 U.S. at 68 (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)); see also id. at 70 (referring to the 'unjustifiably high risk' of violating the statute necessary for reckless liability.").  Under this standard, actual knowledge of a problem or risk is not necessary for a finding of recklessness where the risk is so obvious that a CRA should have been aware of it.

The remainder of Defendant's arguments disregards the second part of this standard, and the Court, again, concludes that there was sufficient evidence for a jury to find that Defendant's

failure to employ certain reasonable procedures ran an unjustifiably high risk of violating FCRA. The evidence discussed in the Court's Rule 50(a) decision and in the section on negligence, supra, is equally applicable to the issue of recklessness.  And while Defendant asserts that punitive damages "requires more than testimony about internet searches and 'common sense,'" Def. Br. at 9, it fails to provide the Court with any type of authority or case law, aside from Sarver, that challenges the Court's earlier conclusion that certain policies and procedures (or lack thereof) can support a finding of willfulness, and that CRAs can act willfully with respect to a particular transaction.[7]

Here, a jury could conclude that the information contained on David Oscar Smith's criminal history was materially different from the rest of the information in Plaintiff's background report such that, by failing to employ procedures to identify and resolve that discrepancy, Defendant ran an unjustifiably high risk of reporting inaccurate information generally, and about Plaintiff, in particular.[8]  Furthermore, given the importance placed on the middle name in determining which records to include in a report, and the ease with which this issue could be addressed in the initial search request, a jury could find that a failure to elicit information regarding a middle name posed an unjustifiably high risk in general, and to Plaintiff in particular.  Consequently, the Court also declines to disturb the jury's verdict on the issue of willfulness.

---

[7] The Court rejects Defendant's reliance on Sarver here for the same reasons described supra.

[8] Indeed, under Defendant's own argument, that discrepancies among credit reports from third-party credit bureaus and criminal reports pulled from Defendant's criminal database are sufficiently common such that reviewing and investigating each one would not be reasonable, a jury might even be within its prerogative to conclude that Defendant was aware of the flaws in its procedures and still failed to take reasonable steps to correct those flaws.

### C.  Plaintiff Presented Sufficient Evidence on Compensatory Damages

In his Rule 50(a) supplemental briefing, Plaintiff suggested that Defendant had waived its right to contest actual damages, on the grounds that Defendant had moved for judgment as a matter of law on just two of the three categories of damages presented to the jury — economic loss and emotional distress — and that there was sufficient evidence of the third category — reputational harm — to submit the issue of damages to the jury on that alone.  Smith, 76 F. Supp. 3d at 666.  The Court did not address the issue previously, because it found that there was sufficient evidence on the issue of lost wages and emotional distress to submit to the jury. Id.  In its Rule 50(b) motion, Defendant presents additional arguments as to why it can contest actual damages — mainly, that emotional distress and reputational harm are linked.  Def. Br. at 11.  However, because the Court again finds that Plaintiff presented sufficient evidence on both economic loss and emotional distress, it again elects not to address the issue of waiver.

#### 1.  Emotional Distress

Defendant repeats its earlier argument that Plaintiff's emotional distress stemmed not from the erroneous report, but from the Smith family's financial situation, which would have been severe even absent the error because the merchandiser job — the position Plaintiff was initially offered — paid less than the delivery-driver position — the job Plaintiff wanted and for which he had originally applied.  Def. Br. at 12.  Defendant further submits that Bach v. First Union National Bank (Bach I), 149 F. App'x 354 (6th Cir. 2005), which upheld an award that included a significant amount for emotional damage, is distinguishable because (i) the injury in Bach I spanned two years, during which the CRA repeatedly refused to correct the error; and (ii) "the defendant's actions prevented the plaintiff from obtaining a loan that would have solved a problem."  Def. Br. at 13.  In contrast to Bach I, Defendant submits that it corrected the error,

and that its error merely prevented Plaintiff from obtaining the merchandiser position, the income from which would have still left the Smith family short every month. Id. In response, Plaintiff asserts that only a "causal link" between the violation and the injury is necessary, and that such a determination requires weighing of the evidence and credibility — distinctly a jury role. Pl. Br. at 9. Plaintiff further asserts that his and his wife's testimony spelled out in sufficient detail the impact the report had on their lives, which permitted the jury to conclude that Plaintiff suffered from emotional distress. Id. at 9-10.

Defendant's arguments are meritless. For one thing, a jury was entitled to conclude that Plaintiff's emotional distress stemmed from his inability to work. While Plaintiff would not have earned as much at the merchandiser position than as a delivery driver, he would have been working and contributing to the family finances. It is reasonable to conclude that some income is better than no income at all. Additionally, there was testimony that employees had the ability to switch positions within GLWS if a better opportunity arose; this may make certain forms of financial stress more bearable. Ultimately, Plaintiff's testimony regarding his emotional distress was not tied solely to the family's finances, but also spoke to his own feelings of depression and worthlessness with respect to his career and inability to work, as well as his inability to provide any type of financial support for the family during that period.

In addition, the Court does not find Defendant's attempts to distinguish Bach I persuasive. Defendant argues that "[w]hen a plaintiff can show that he gave notice of a problem with a consumer report, and that it caused a problem, the court may conclude that he 'does not rely on mere conclusory statements,' because he has established the notice and the problem"; but here, "Plaintiff does 'rely on mere conclusory statements,' because [Defendant] corrected his report upon notice, and he would have suffered the same problem . . . work[ing] as a

merchandiser." Def. Br. at 13 (emphasis in original). What Defendant may mean to convey is not entirely free from doubt. But the short answer is that Plaintiff here did not rely on conclusory statements to establish emotional harm.

Defendant also urges the Court to reconsider its rejection of the reasoning in Moore v. First Advantage Enterprise Screening Corp., No. 4:12 CV00792, 2013 WL 1662959 (N.D. Ohio Apr. 17, 2013). See Smith, 76 F. Supp. 3d at 668 (declining to follow the reasoning in Moore as inconsistent with the Sixth Circuit's decision in Bach I). Defendant asserts that numerous courts have found no tension between the Sixth Circuit's decision in Bach I and Moore, and "have agreed that emotional distress is 'easy to manufacture.'" Def. Br. at 13. The Court declines this invitation. First, neither of the two cases cited by Defendant makes any reference to Moore, let alone explores the reasoning of Moore, undermining Defendant's claim that those cases have found no tension between Moore and Bach I. Second, in both of those cases, the only evidence presented on emotional distress was a single statement contained in an affidavit or interrogatory that the plaintiff experienced certain physical and mental symptoms as a result of the alleged error or conduct. See Flood v. Equifax Info. Servs., LLC, No. 13-11813, 2014 WL 4243778, at *6 (E.D. Mich. Aug. 26, 2014) (holding that the plaintiff's statements that he "suffered anger and frustration, as well as being insulted and inconvenienced," did not meet the Bach I standard for emotional distress); Kaplan v. Experian, Inc., No. 09-10047, 2010 WL 2163824, at *5-6 (E.D. Mich. May 26, 2010) (holding that the plaintiff's statements that he suffered "lost sleep, aggravation, anxiety, stress, appetite fluctuations, etc.," and that he "became even more nervous, agitated, and anxious" because of a one-day delay in receiving a credit report did not meet the Bach I standard for emotional distress). In those cases, no testimony "reasonably and sufficiently explain[ed] the circumstances surrounding the injury." Bach I, 149 F. App'x at 361.

Here, Plaintiff presented testimony, corroborated by his wife, which fully explained the circumstances surrounding his emotional injury.

Accordingly, Plaintiff presented sufficient evidence on emotional distress to submit the claim to the jury.

### 2. Lost Wages

Defendant continues to contest that Plaintiff submitted sufficient evidence of economic loss in the form of lost wages on the grounds that (i) "Plaintiff testified that the merchandiser job would have been a last resort"; and (ii) Plaintiff's deposition testimony "that he 'did not' accept the merchandiser job because '[he] would not be able to live on that wage and that job description'" undermined his testimony at trial that he would have accepted the job.  Def. Br. at 14.  Defendant argues that Plaintiff's claim for lost wages requires the jury to infer that Plaintiff would have accepted the job when it was first offered, an inference contradicted by Plaintiff's testimony, which, according to Defendant, did not demonstrate that he would have taken the job either immediately or at all.  Id. at 14-15.  Plaintiff responds that Plaintiff's testimony is evidence for the jury, and not the Court, to weigh.  Pl. Br. at 10.

Defendant asks the Court to "find that the plaintiff's 'own testimony … contradict[s] the inference []he would ask the jury to draw' and enter judgment accordingly."  Def. Br. at 15 (quoting Stegall v. Audette, 212 F. App'x 402, 405 (6th Cir. 2006)).[9]  As explained in the

---

[9] In Stegall, the defendant presented evidence, on summary judgment, showing that she was not the officer who assaulted the plaintiff.  Stegall, 212 F. App'x at 404.  In response, the plaintiff did not submit any direct evidence that the defendant assaulted her.  Instead, she relied on circumstantial evidence provided by the defendant through discovery responses to infer two crucial facts: (i) that the defendant was the only female officer at the scene, and (ii) that, if she was the only female officer, she must have been the one to attack the plaintiff.  Id. at 404-405.  The Sixth Circuit observed that this first inference was belied by the plaintiff's own description of the attack, in which she referenced a second female officer, and undermined by the plaintiff's original complaint to the police department, which indicated that additional officers, aside from the named defendants, were present at the scene.  Id. at 405.  Given the evidence presented by

Court's prior decision, however, Plaintiff affirmatively testified that he would have accepted the merchandiser position with GLWS during the transition of ownership.  Smith, 76 F. Supp. 3d at 667.  This is direct evidence on Plaintiff's claim for lost wages, and far from contradicting the inference that he would have accepted the position, it supports it.  To the extent that Plaintiff's testimonial evidence may be contradicted by or undermined by other evidence in the record, weighing that evidence or evaluating Plaintiff's credibility is a task for the jury, not this Court. Moreover, the jury could conclude that Plaintiff suffered <u>some</u> form of economic damages from the loss of work, even if not for the full six weeks.  To conclude that Plaintiff would not have accepted the merchandiser position at all, and, therefore, that he is not entitled to economic damages from wage loss, would substitute the opinion of this Court for that of the jury's.  This the Court cannot do.

For all of these reasons, Defendant's motion for judgment as a matter of law is denied.

### III. DEFENDANT'S MOTION FOR NEW TRIAL AND/OR REMITTITUR

A new trial is required under Rule 59, "only 'when a jury has reached a seriously erroneous result as evidenced by[ ] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias.'"  <u>Mike's Train House, Inc. v. Lionel, L.L.C.</u>, 472 F.3d 398, 405 (6th Cir. 2006) (quoting <u>Holmes v. City of Massillon</u>, 78 F.3d 1041, 1045-1046 (6th Cir. 1996)).  To protect a litigant's Seventh Amendment right to a jury trial, the Sixth Circuit has cautioned judges against supplanting a jury's determination of the facts and credibility of the witnesses with his or her own opinion.  <u>Holmes</u>, 78 F.3d at 1047.

the defendant, in addition to the contradictions inherent in the plaintiff's own argument, the Sixth Circuit concluded that the inference that the named defendant had attacked the plaintiff was implausible.  <u>Id.</u>  However, in the present case, Plaintiff's case is not premised on any inference; it is based on his own direct testimony regarding whether he would have taken the merchandiser position.

Accordingly, "the trial court should deny [a motion for a new trial] if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." Wayne v. Vill. of Sebring, 36 F.3d 517, 525 (6th Cir. 1994); Holmes, 78 F.3d at 1047-1048, 1048-1049 (collecting cases and concluding that if a reasonable juror could find for the plaintiff, a motion for new trial should be denied).

**A.  The Verdict Was Not Against the Weight of the Evidence**

Defendant asserts that it is entitled to a new trial on the grounds that the verdict was against the weight of the evidence.  Def. Br. at 15.  In support of its argument, Defendant relies on the same reasons set forth in its motion for judgment as a matter of law.  Id.

As described in detail above, and in this Court's Rule 50(a) decision, a jury could reasonably find that Defendant both negligently and recklessly failed to maintain reasonable procedures for assuring maximum possible accuracy of Plaintiff's consumer report, and that Plaintiff suffered emotional and economic injury as a result of the subsequent error.  To conclude otherwise, on any of those points, would impermissibly usurp both the jury's role to consider all of the evidence presented and the inferences and conclusions that the jury drew from that evidence.  Because a reasonable jury could have found for Plaintiff on the issues of negligence, recklessness, and damages, the Court denies Defendant's request for a new trial on the grounds that the verdict was against the weight of the evidence.

**B.  Excessiveness of Damages**

**1.  Compensatory Damages**

A motion for remittitur should be granted "only 'if the award clearly exceeds the amount which, under the evidence in the case was the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss.'"  Bickel v. Korean Air Lines Co., Ltd., 96 F.3d 151, 156

(6th Cir. 1996) (emphasis in original) (quoting In re Lewis, 845 F.2d 624, 635 (6th Cir. 1988)). Thus, "[a] trial court is within its discretion in remitting a verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." Am. Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 475 (6th Cir. 2004).

Defendant argues that the jury's award for emotional distress, approximately $70,000, greatly exceeds amounts awarded in other cases, especially considering that Defendant corrected the error within 30 days. Def. Br. at 15-16. According to Defendant, awards greater than $25,000 have been found appropriate only where a plaintiff made repeated attempts, without success, to correct an erroneous report, but here Plaintiff's report was promptly corrected and he ultimately received the job he desired. Id. at 16 (citing cases). Plaintiff dismisses the cases on which Defendant relies as outdated, and states that the current verdict is both consistent with the evidence presented and not out of line with more recent jury awards for emotional distress under FCRA. Pl. Br. at 11-12. Defendant maintains that those larger awards are predicated on FCRA plaintiffs who have repeatedly tried and failed to correct a report. Def. Reply at 4.

The jury awarded Plaintiff $75,000 in compensatory damages. Although the jury instructions recited three categories of damages, the verdict form did not allocate the amount of damages among the three categories. At most, $2,640 can be attributed to economic loss, per the parties' stipulation at trial, leaving $72,360 attributable to emotional distress and/or harm to reputation. There is no specific argument that the verdict amount "shocks the conscience," nor does Defendant contend it was the product of a mistake, or that it arose out of passion, prejudice, or bias. Rather, Defendant appears to argue, by reference to other FCRA cases, that the award is

beyond the range supported by the evidence presented at trial.  Notably, Defendant does not offer a number that it believes is more appropriate, although it hints that anything over $25,000 is excessive.  Def. Br. at 16.

The Sixth Circuit's decision in Bach I provides guidance on this point.  The Court's Rule 50(a) decision identified certain shared features between the plaintiff in Bach I and Plaintiff here. See Smith, 76 F. Supp. 3d at 667-668.  For instance, the plaintiff in Bach I was vulnerable due to her health and recent stroke, which may have exacerbated her emotional distress; here, the Smith family was financially vulnerable, which greatly exacerbated the emotional distress felt by Plaintiff.  Id.  Additionally, Plaintiff testified that he felt depressed about how he was going to make a living and his inability to provide for his family, and that he was ashamed for having to borrow money to make ends meet, which accorded with the Bach I plaintiff's testimony of feeling ashamed, desperate, and embarrassed.  Id.  Plaintiff and his wife also testified to the effect of the incident on their marriage, calling that time period the most stressful they had experienced to date.  Id. at 668.  The evidence regarding emotional distress among the two cases appear to be similar in certain respects, and in Bach I the Sixth Circuit upheld a $400,000 emotional distress award — an amount significantly greater than what the jury awarded Plaintiff here.  It is true, that the plaintiff in Bach I struggled to get her credit reports corrected for a year and a half, with multiple notices, letters, and calls to the defendant, some of which resulted in harassing behavior from the defendant in response, Bach I, 149 F. App'x at 356-358, but that distinction may simply justify the more than $300,000 difference in the emotional distress award.

Furthermore, the jury award does not seem excessive in light of other cases identified by Plaintiff.  For example, in Sloane v. Equifax Information Services, LLC, 510 F.3d 495, 498-499, 503-504, 507 (4th Cir. 2007), the Fourth Circuit remitted an award for emotional distress to

$150,000 on the basis of specific and corroborated testimony as to the anxiety, humiliation, and anger the plaintiff felt as a result of the defendant's failure for 21 months to correct credit errors caused by identity theft; the physical symptoms she experienced as a result; and the impact of the errors on her marriage, including the contemplation of divorce.   The award in Sloane exceeds Plaintiff's award by two times, but the plaintiff in Sloane suffered a great deal more distress over a significantly longer period.   Moreover, the Fourth Circuit observed that more recent FCRA cases involving "isolated or accidental reporting errors," "suggests that approved awards more typically range between $20,000 and $75,000."   Id. at 505.

The Third Circuit upheld a $50,000 emotional distress award on the basis that the plaintiff "suffered severe anxiety, fear, distress, and embarrassment," experienced loss of sleep requiring medication, frequent crying spells out of frustration, weight loss, and stress due to an erroneous notation that her name appeared on a list of suspected terrorists.   Cortez v. Trans Union, LLC, 617 F.3d 688, 719 (3d Cir. 2010).   As a result of the misinformation, the plaintiff's application for automobile financing was delayed several hours; the defendant failed to remove the notation for approximately 18 months, causing the plaintiff to have to explain the mistake in attempting to lease an apartment.   Cortez v. Trans Union, LLC, No. 05-cv-05684-JF, 2007 WL 2702945, at *1-2 (E.D. Pa. Sept. 13, 2007).

The Tenth Circuit has upheld a $61,500 award arising from testimony "that the credit report incident is a continuing cause of emotional distress, and that the improper request for the report caused serious and continuing problems in [the plaintiff's] marriage, due to his initial misunderstanding about his wife's role in the request, his wife's resignation from defendant and subsequent unsatisfactory employment, and separations occasioned by his wife's seeking

employment elsewhere." Zamora v. Valley Fed. Sav. & Loan Ass'n of Grand Junction, 811 F.2d 1368, 1371 (10th Cir. 1987).

The jury's award is further on par with a case in this circuit, Boris v. Choicepoint Services., Inc., 249 F. Supp. 2d 851 (W.D. Ky. 2003). There the court determined that a jury could find damages for emotional distress as high as $75,000, based on testimony from the plaintiff and her co-workers regarding the plaintiff's "worry, stress, anxiety, loss of sleep, and anger," including testimony that the plaintiff cried or was otherwise unable to function properly at work due to inaccurate information regarding past insurance claims on the plaintiff's claims report that persisted for approximately a year and a half. Id. at 855, 859-860, 860-861. Yet another court in this circuit remitted a $2,000,000 jury award to $50,000 based on the "plaintiffs' testimony of worry, stress, anxiety, loss of sleep and expense in bringing litigation." Anderson v. Conwood Co., 34 F. Supp. 2d 650, 655-656 (W.D. Tenn. 1999).

In contrast, other courts have found emotional distress to warrant somewhat smaller awards. The Fifth Circuit remitted damages from $100,000 to $25,000 on the basis of testimony "that [the plaintiff] was embarrassed and humiliated about the credit denials from several retail stores," which resulted in "a substantial measure of temporary public humiliation." Pinner v. Schmidt, 805 F.2d 1258, 1265 (5th Cir. 1986). Another, slightly more recent, Fifth Circuit case upheld a $30,000 award on the basis that the plaintiff experienced a "terrific shock" when discovering his poor credit rating, that he was denied credit from retail stores on three different occasions, and that he had suffered "considerable embarrassment" in having to explain his credit problems to various business associates and creditors; the inaccuracies persisted for over a year. Stevenson v. TRW Inc., 987 F.2d 288, 297 (5th Cir. 1993).

Plaintiff's distress was not inconsiderable. After submitting his information for a background check in connection with an application for employment under a new employer, Plaintiff received notice of criminal convictions associated with his name on a report submitted to that employer. On the basis of that report, GLWS withdrew Plaintiff's offer of employment and affirmatively told him that he would need to address the issue with Defendant. Plaintiff did so, but did not know whether the error would be fixed, and, even if it was fixed, whether there would be a job available for him at that time. Plaintiff testified that he sought out employment elsewhere to no avail. Plaintiff and his wife testified to the impact the loss of income had on their family finances, their marriage, and Plaintiff's well-being. They identified concrete and practical concerns associated with the loss of income, including unpaid bills, and Plaintiff spoke with emotion about his embarrassment at having to ask his family for help. All of this supports an award for emotional damages. And while an award of $72,000 is certainly generous, and may sit on the high end of what would be appropriate under these circumstances, it is not significantly greater than what other courts have deemed appropriate when faced with similar, if not lesser, stressors.

For instance, while the repeated denial of credit may be embarrassing or difficult to explain, and certainly repeated and fruitless efforts to fix a single mistake can cause significant frustration, such distress is different in kind and degree than when a reporting error jeopardizes a plaintiff's ability to make important bill payments or become eligible for a job opportunity, or when the error begins to negatively affect something as personal as one's marriage. Accordingly, the Court places less weight on cases such as Pinner and Stevenson, and more weight on cases such as Sloane and Zamora. Furthermore, the Court does not believe the present award to be incongruous with FCRA awards in this circuit as evidenced by Bach I, Boris, and

28

Anderson, particularly given the nature of the alleged injuries and supporting testimony, and the sums involved.

As such, the Court cannot say the verdict was excessive and declines to interfere in the jury's calculation of Plaintiff's intangible harm.  Defendant's request for remittitur of the emotional distress award is denied.

### 2.  Punitive Damages

Defendant submits that, even if the evidence were to support a finding of willfulness, the jury's punitive damages award was excessive under the well-known factors set forth for assessing the constitutionality of punitive damages.  Def. Br. at 17.  The Court agrees.

Three guideposts govern the evaluation of the jury's $300,000 punitive damages award: (i) the degree of reprehensibility; (ii) the disparity between the harm, or potential harm, and the punitive damages award; and (iii) the difference between the amount awarded and civil penalties authorized or imposed in comparable cases.  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-575 (1996).  The Court addresses each guidepost in turn.

### i.  Reprehensibility

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  Gore, 517 U.S. at 575.  To that end, the Court should consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

Defendant asserts that its conduct could not be considered reprehensible, because only one of the five State Farm factors is established: Plaintiff's financial vulnerability.  Def. Br. at 18-19.

In response, Plaintiff argues generally, without breaking down Defendant's conduct according to the five listed factors, that Defendant's conduct was reprehensible, because Defendant was on notice of its responsibility to assure maximum possible accuracy of consumer reports and of the precise error that occurred here, but failed to implement a policy or practice to address those errors.  Pl. Br. at 15-17.  Plaintiff further argues that the five-factor State Farm analysis is not a good match for FCRA cases.  Id. at 17-18.  Specifically, Plaintiff suggests that the first two factors should carry very little weight in the FCRA context, because a FCRA plaintiff's injury will almost always be economic in nature, and that the final factor, as it relates to malice, should also be discounted, because willful FCRA violations do not require malicious intent.  Id. at 18.  Plaintiff also argues that the reprehensibility factors are adequately satisfied here, and even if not all met, the absence of all five merely renders an award suspect, but not necessarily unconstitutional.  Id. at 19-20.[10]

---

[10] In its reply, Defendant makes a bald statement that the Supreme Court's decision in Safeco stands for the proposition that "punitive damages can only be awarded in FCRA cases if the defendant had notice, via an agency opinion, or an appellate decision, that its procedures were unreasonable," and that Plaintiff has failed to cite to any such authority indicating that Defendant's procedures were unreasonable.  Def. Reply at 6.  As discussed earlier, the lack of authoritative guidance was simply one factor the Supreme Court considered in determining whether a CRA's interpretation of the law was unreasonable; it was not a necessary condition for a finding of recklessness.  Furthermore, as numerous courts have discussed, whether a defendant used reasonable procedures is overwhelmingly a question for a jury.  As a result, there are likely to be few court opinions setting forth what exactly is reasonable and what is not.  Given the lack of authoritative court guidance on what is unreasonable, Defendant's theory would rarely permit a CRA to be liable for punitive damages because there is simply unlikely to be an authoritative court opinion directly on point, or one that speaks to Defendant's precise procedures to put Defendant on the requisite notice.

While Plaintiff may believe that the State Farm factors are ill-suited to FCRA cases, the Sixth Circuit disagrees. In evaluating the constitutionality of the punitive damages award in Bach I, the Sixth Circuit expressly used the framework set forth in State Farm. Bach I, 149 F. App'x at 364-366.[11] The Court will follow suit, and agrees that only one of the five reprehensibility factors — Plaintiff's financial vulnerability — is satisfied here. No physical harm occurred, and the conduct did not evince a reckless disregard for the health and safety of others.

There is also no evidence that the error committed here has occurred on a widespread scale. Indeed, the only evidence offered on this point is approximately 768 disputes across four states where consumers alleged that a criminal record belonging to another person appeared on their background report, and approximately ten lawsuits against Defendant claiming that inaccurate information was placed on a consumer background report. See Tr. Vol. 3 55:22-61:10 (Dkt. 48). However, there is no evidence that these other disputes were the result of the same unreasonable conduct at issue here. While the evidence shows that a certain number of disputes regarding allegedly erroneous criminal backgrounds were lodged with Defendant, there is no information as to whether these disputes were meritorious. And even if meritorious, there is no indication that these misidentifications were the result of insufficient information about the consumer, i.e., lack of middle name, or whether there was an internal inconsistency within that

---

[11] Moreover, the decision on which Plaintiff principally relies in urging the Court to reject or discount the five-factor analysis explicitly states that Bach I's "reasoning appears to be soundly applicable to FCRA cases where both compensatory and punitive damages have been awarded by a jury," and distinguished the case before it on the grounds that the plaintiff had only been awarded low-end statutory damages. Saunders v. Equifax Info. Servs., L.L.C., 469 F. Supp. 2d 343, 354 (E.D. Va. 2007) (emphasis in original), aff'd, Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008). Here, both compensatory and punitive damages were awarded.

consumer's background report that might have suggested the criminal history was erroneous or otherwise suspect.

And finally, the fifth and final factor — whether the conduct was the product of intentional malice — is not met. While a reasonable jury could find Defendant's conduct to be negligent or reckless, there is no evidence that Defendant acted out of intentional malice, trickery, or deceit.

Therefore, the first guidepost weighs in favor of reducing the punitive damages award.

### ii. Disparity between the harm suffered and the size of the punitive damages award

Punitive damages "must bear a 'reasonable relationship' to compensatory damages." Gore, 517 U.S. at 580. Accordingly, courts look to "'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" Id. at 581 (quoting TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993)). While the Supreme Court has been reluctant "to impose a bright-line ratio which a punitive damages award cannot exceed," it has observed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 424-425. Indeed, a punitive damages award four times greater than the compensatory award — the ratio between the two awards in this case — "might be close to the line of constitutional impropriety." Id. at 425. Moreover, courts should be wary of substantial compensatory damages that likely contain a punitive component, as is often the case with emotional-distress awards. See id. at 426; Bach v. First Union Nat'l Bank (Bach II), 486 F.3d 150, 154 (6th Cir. 2007); Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 489 (6th Cir. 2007). In those circumstances, an even lesser ratio may be appropriate. State Farm, 538 U.S. at 425-426.

Where reprehensibility is low and compensatory damages are substantial, the Sixth Circuit has generally found a 1:1 or 2:1 ratio to be the upper limit. Bach II, 486 F.3d at 156-157 (settling on a 1:1 ratio where plaintiff was awarded $400,000 in compensatory damages and only one reprehensibility factor was present); Bridgeport Music, 507 F.3d at 487-490 (holding 2:1 or 1:1 ratio was all that due process tolerated where $366,939 in compensatory damages was awarded and one reprehensibility factor was present); Clark v. Chrysler Corp., 436 F.3d 594, 606-609 (6th Cir. 2006) (concluding a 2:1 ratio was appropriate where $235,629 was awarded in compensatory damages and one reprehensibility factor was present).

Here, Plaintiff was awarded $75,000 in compensatory damages — not an insubstantial sum. See Arnold v. Wilder, 657 F.3d 353, 372 (6th Cir. 2011) ($57,400 in compensatory damages not a nominal amount). Importantly, almost the entirety of that amount can be attributed to emotional distress and/or reputational harm, thus the compensatory damages award already encompasses what the Supreme Court and Sixth Circuit have described as a punitive element. Therefore, in light of the low reprehensibility of Defendant's conduct, as well as the amount and the nature of the compensatory damages award, the Court concludes that a 2:1 ratio is the outer bounds of what is constitutionally permissible in this case.

While Plaintiff cites to a number of out-of-circuit cases affirming much higher ratios, the Court does not find those cases to be persuasive. In many of those cases, the compensatory damages were nominal, or significantly smaller, warranting higher ratios. Pl. Br. at 20 (citing cases involving compensatory amounts of $1, $2,000, and $4,000).

Moreover, Plaintiff is wrong in arguing that the Court could, and should, add mandatory attorney fees and costs to compensatory damages when undertaking a comparison with punitive damages. First, the court in the case on which Plaintiff relies acknowledged the "conceptual

difficulty" that the comparison created.  Willow Inn, Inc. v. Pub'l Serv. Mut. Ins. Co., 399 F.3d 224, 235 (3d Cir. 2005).  Second, the court theorized in that case — where the insurer in bad faith unreasonably delayed settlement — that "attorney fees and costs awarded . . . is the proper term to compare to the punitive damages award for ratio purposes," because the promise of attorney fees is the mechanism that permits parties to secure counsel and bring actions to vindicate the type of dilatory conduct at issue.  Id. at 235-236.  Here, FCRA permits both actual — in the form of economic and emotional distress — and punitive damages.  Actual damages fairly represent the harm suffered, or likely to have resulted, from the defendant's conduct, and are readily available for comparison purposes; thus, no valid purpose is served by including attorney fees into the calculations.

### iii.  Sanctions for comparable misconduct

The third guidepost looks toward civil or criminal penalties for comparable misconduct, because legislative judgments as to the type and amount of sanctions for the conduct at issue should be given "substantial deference."  Gore, 517 U.S. at 583.  The Sixth Circuit has noted that the maximum civil penalty the Federal Trade Commission could seek for each knowing violation of FCRA was not applicable to private actions brought by individual citizens, making this final guidepost "not particularly helpful in assessing the constitutionality of the punitive damage[s] award."  Bach I, 149 F. App'x at 367.

Thus, the Court relies on the first two guideposts in finding that a 2:1 ratio — i.e., a punitive damages award of $150,000 — is the outer bounds of what is constitutionally permissible in this case.

34

### iv.  Appropriate relief

Regarding the appropriate relief in these circumstances, Plaintiff points to a distinction between a request for a constitutional reduction of punitive damages and a request for remittitur of punitive damages.  Pl. Br. at 12-13.  Plaintiff asserts that Defendant has raised only a constitutional challenge to the punitive damages award and, accordingly, no remittitur is possible here, just a constitutional reduction.  Id. at 12-14.  In reply, Defendant relies on the Sixth Circuit's failure to distinguish between the two in Bach I, and thus argues that this Court may not draw such a distinction.  Def. Reply at 5.

Other courts have drawn the distinction described by Plaintiff, and the Court finds the reasoning underlying that distinction persuasive.  For example, the Eleventh Circuit observed the difference between reducing a jury's verdict on the grounds that the verdict is unsupported — amounting to judicial review of a jury's factual determination — and reducing a punitive damages award on the grounds that it is prohibited by the Constitution — a legal analysis that does not undermine a jury's factual findings.  Johansen v. Combustion Eng'g, 170 F.3d 1320, 1331 (11th Cir. 1999).  The Johansen court explained that because the Seventh Amendment prohibits courts from reexamining a jury's determination of the facts, a plaintiff's consent is required for remitting a jury award; in the absence of consent, a court can only exercise its inherent power to order a new trial.  Id. at 1328-1329.  Indeed, a plaintiff must be given the option of a new trial in lieu of a remittitur.  Hetzel v. Prince William Cnty., Va., 523 U.S. 208, 211 (1998) (per curiam).  However, nothing prohibits a court from reexamining a jury's verdict for errors of law, and a court has both an obligation and the power to do so.  Johansen, 170 F.3d at 1330.  Accordingly, the Eleventh Circuit concluded that, upon determining the constitutional limit of a punitive damages award, the court may enter judgment, as a matter of law, for that

amount, without offering the option of a new trial.  Id. at 1331-1332.  The Johansen court further

observed that a new trial would serve no purpose, because a new jury could not enter a punitive

award higher than what the court had already determined was constitutionally permissible.  Id. at

1332 n.19.

The Court recognizes that the Sixth Circuit in Bach I did not draw this distinction, but

neither did it undertake any substantive analysis of this issue.  See Bach I, 149 F. App'x at 367.

It also appears that there is no consistent practice among Sixth Circuit panels.  See Arnold, 657

F.3d at 372 (modifying punitive damages award and directing entry of judgment in accordance);

Morgan v. New York Life Ins. Co., 559 F.3d 425, 443 (6th Cir. 2009) (vacating punitive

damages award as unconstitutionally excessive with instructions to enter an order of remittitur on

remand); Bridgeport Music, 507 F.3d at 490 (remanding for remittitur of punitive damages or a

new trial); Clark, 436 F.3d at 608-609 (remanding for entry of a reduced award, conditioned on

the plaintiff's acceptance, or a new trial); Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 650

(6th Cir. 2005) (remanding with instructions to give plaintiff option of remitted punitive damages

award or new trial).

In the absence of clear guidance from the Sixth Circuit, the Court adopts the Eleventh

Circuit's approach.  Because the Court agrees with Plaintiff that Defendant has raised only a

constitutional argument, it will enter a modified judgment to reflect the reduction in punitive

damages.  See Cummings Inc. v. BP Prods. N. Am., Inc., 648 F. Supp. 2d 969, 987 n.7 (M.D.

Tenn. 2009) (adopting the Eleventh Circuit's approach and entering judgment reducing punitive

damages award).  This approach corrects the legal error contained in the jury's verdict and

avoids a new trial on damages, which would serve no purpose.

Therefore, the Court will reduce the jury's award of punitive damages to twice the amount of compensatory damages and enter a modified judgment that will include only $150,000 for punitive damages.

### 3. Mistakes at Trial

Finally, Defendant alleges that, to the extent the jury's verdict was not supported by sufficient evidence, was contrary to the weight of the evidence, or was otherwise excessive, it was due to the following purported mistakes at trial:

- The Court failed to include a statement that emotional distress is easy to manufacture in the jury instructions, which would have deterred the jury from returning excessive and unsupported awards.

- The Court included a jury instruction regarding a CRA's ability to disclaim liability in fine print, which prejudiced Defendant by suggesting that Plaintiff's background report contained improper language.

- The Court rejected Defendant's proposed verdict form which would have asked the jury to determine first whether Defendant followed reasonable procedures; a failure which led the jury to assume that Defendant failed to follow reasonable procedures.

- Plaintiff repeatedly asserted that Defendant did not use his social security number in preparing Plaintiff's report, when Defendant did, in fact, use Plaintiff's social security number to exclude records containing a different social security number. This mischaracterization of the evidence was an attempt "to persuade the jury that [Defendant's] alleged failure to do a seemingly obvious thing (use a social security number to avoid inaccuracies) was not just negligent, but reckless."

Def. Br. at 20-21. Plaintiff asserts that Defendant failed to provide any legal or factual development in support of its contentions, and that there is no reason to conclude any of the alleged mistakes are grounds for a new trial. Pl. Br. at 24 n.15. Other than to cursorily repeat

some of its earlier assertions, see, e.g., Def. Reply at 2 n.1, 4, Defendant does not return to these alleged mistakes in its reply.

The Court agrees with Plaintiff that Defendant has failed to provide any factual development or legal authority as to why such mistakes warrant a new trial.  McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alterations in original)).  These issues are deemed waived, and, in any case, lack merit.

First, the statement "emotional distress is easy to manufacture" is not a statement of the law.  Defendant provides no authority in its brief indicating why it would be entitled to such an instruction, other than to summarily state that other courts in this circuit have approved and used it.  However, while other courts in this circuit may have quoted the above language in an opinion, Defendant has not provided the Court with court decisions approving jury instructions with such statements.  Moreover, such a statement is unnecessarily inflammatory, and may cause a jury to believe, on a basis other than its own independent evaluation of the credibility of the witnesses, that a plaintiff is fabricating his claim of emotional distress.

Second, Defendant has provided no legal authority suggesting that a CRA can disclaim liability for errors on a report; thus there is no indication that the referenced jury instruction contains an inaccurate statement of the law.  Cf. Eller v. Experian Info. Solutions, Inc., No. 09-CV-00040-WJM-KMT, 2011 WL 3365955, at *8 (D. Colo. May 17, 2011) (CRA cannot "contract out of its statutory obligations by entering into settlement agreements with consumers."), report adopted on other grounds by 2011 WL 3365513 (D. Colo. Aug. 4, 2011).

Furthermore, Defendant was the party that called attention to the disclaimer, which prompted Plaintiff's request to add the additional jury instruction.  See Tr. Vol. 3 120:6-121:18 (counsel agreeing that Defendant solicited testimony with respect to the disclaimer contained in the report's fine print).  Defendant does not explain how it can introduce evidence that it warned readers of the report that all of the information contained in the report may not be accurate, but then claim that an instruction informing the jury that Defendant cannot disclaim its liability under FCRA is somehow prejudicial.

Third, the jury was instructed that FCRA requires CRAs to use reasonable procedures to assure maximum possible accuracy.  Jury Instructions at 15 (cm/ecf page) (Dkt. 37).  The jury was also instructed that, if it found that Defendant was negligent in fulfilling this duty, it could award damages. Id. at 17 (cm/ecf page).  This is a correct statement of the law.  If the jury found that Defendant used reasonable procedures, it could have checked "no" under the question, "[d]id Defendant [ ] negligently fail to follow reasonable procedures to assure the maximum possible accuracy of the information on the report it sold about [Plaintiff]."  Verdict Form at 1 (cm/ecf page) (Dkt. 35).

Fourth, even if Plaintiff did mistakenly reference Defendant's failure to use a social security number in searching the proprietary nationwide criminal database, this mistake only speaks to one theory of liability.  And, as Defendant noted, he corrected these mistakes in his closing argument.  Def. Br. at 21.  No reasonable claim of prejudice is made out.  And, by failing to object, Defendant's burden to show prejudice is a "heightened" one.  See Bridgeport Music, 507 F.3d at 478 (failure to object to allegedly improper comments during closing argument requires heightened degree of prejudice); Strickland v. Owens Corning, 142 F.3d 353, 358 (6th Cir. 1998) (same); Portis v. Grand Trunk W. R.R. Co., 28 F.3d 1214, 1994 WL 362110, at *3

(6th Cir. July 12, 1994) (table) (reviewing for "gross injustice" where defendant failed to object to plaintiff's statements during closing).  Defendant cannot meet that heightened burden.

Accordingly, the Court finds Defendant's arguments that purported mistakes led to an unsupported verdict both undeveloped and unpersuasive.

## IV.  CONCLUSION

For the above reasons, the Court denies Defendant's renewed motion for judgment as a matter of law, and grants in part and denies in part Defendant's motion for new trial and/or remittitur (Dkt. 57).

SO ORDERED.

Dated:  September 30, 2015                    s/Mark A. Goldsmith_____
     Detroit, Michigan                    MARK A. GOLDSMITH
                                   United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2015.

s/Carrie Haddon_____
Case Manager